**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 22-90032** |
| GWG HOLDINGS, INC., GWG LIFE, LLC, | § | |
| GWG LIFE USA, LLC, GWG DLP | § | **CHAPTER 11** |
| FUNDING IV, LLC, GWG DLP FUNDING | § | |
| VI, LLC, GWG DLP FUNDING | § | |
| HOLDINGS VI, LLC, | § | |
| | § | |
| Debtors. | § | |
| | § | |
| MICHAEL I GOLDBERG, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | **ADVERSARY NO. 25-3064** |
| | § | |
| HOLLAND & KNIGHT LLP and | § | |
| WILLIAM ("BILL") BANOWSKY, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION

This Court is presented with Defendants Holland & Knight LLP and William Banowsky's

Motion to Dismiss the Complaint filed by Michael I. Goldberg, as Trustee of the GWG Litigation

Trust, pursuant to Federal Rule of Bankruptcy Procedure 7012(b)(6), which incorporates Federal

Rule of Civil Procedure 12(b)(6). Dkt. No. 20. Michael I. Goldberg, (the "*Trustee*") as Trustee of

the GWG Litigation Trust ("*GWG Trust*"), brought a complaint (the "*Complaint*") against a law

firm, Holland & Knight LLP ("*Holland & Knight*" or "*HK*"), and a HK lawyer, William Banowsky

("*Banowsky*"), (together "*Defendants*") to recover money damages for Banowsky's alleged acts

and omissions while serving as legal counsel to non-GWG business entities associated with the

former GWG Chairman of the Board, Brad Heppner ("*Heppner*"). Dkt. No. 1, ¶¶ 1, 4. The

Complaint alleges that Defendants knowingly participated in a fraudulent scheme perpetrated by

Heppner whereby Heppner used HCLP Nominees, LLC as a front to extract over $100 million from GWG Holdings, Inc. ECF No. 1 ¶¶ 1, 4. The Trustee asserts six causes of action: (1) Count I: Civil RICO violations under 18 U.S.C. § 1962(c); (2) Count II: RICO conspiracy under 18 U.S.C. § 1962(d); (3) Count III: Aiding and Abetting/Knowing Participation in Breach of Fiduciary Duty; (4) Count IV: Civil Conspiracy; (5) Count V: Fraud (November 2019 Call); and (6) Count VI: Negligent Misrepresentation (November 2019 Call). Dkt. No. 1.

Defendants argue the Complaint should be dismissed for failure to state a claim. Specifically, Defendants contend that: (1) the Trustee is without standing to pursue the claims; (2) Defendants are immune under the Texas attorney-immunity doctrine; (3) the claims are barred by the applicable statutes of limitations; (4) the RICO claims, as predicated on alleged securities fraud, are barred by the Private Securities Litigation Reform Act of 1995; and (5) the Trustee either pleaded itself out of court or failed to plausibly plead any of its claims.

For the reasons stated herein, the Court finds that the Trustee has adequately pleaded standing to assert the claims in the Complaint.

First, the "specific and unequivocal" standard articulated in *Dynasty Oil and Gas, L.L.C. v. Citizens Bank (In re United Operating, L.L.C.)*, 540 F.3d 351 (5th Cir. 2008) does not apply in this case where claims are being asserted against non-creditor parties. The Plan's retention of "any claim [or] cause of action" is thus sufficient to retain the claims against Defendants. Defendants' Motion to Dismiss based on standing is therefore DENIED.

Second, the Court finds that although Texas attorney immunity is an important protection that serves vital public policies, it is not a license for fraud. Here, the Trustee has alleged facts that, if proved, would demonstrate that Banowsky: (i) took direction from Heppner, a non-client, rather than from HCLP's managers; (ii) made knowing misrepresentations about HCLP's ownership and

control structure; (iii) coordinated with Heppner to engineer backdated restructurings designed to deceive GWG; (iv) made false threats of foreclosure to pressure GWG into unfavorable transactions; (v) served as trustee of trusts within the alleged RICO enterprise (a non-legal role); and (vi) acted to further Heppner's fraudulent extraction scheme rather than to serve HCLP's legitimate interests. These allegations are sufficient to survive dismissal at the pleading stage. Defendants' Motion to Dismiss on attorney immunity grounds is therefore DENIED.

Third, the Court finds that Defendants have not carried their burden to establish on the face of the pleadings that the Trustee's claims are time-barred. The Complaint alleges injuries occurring between 2019 and 2021, all within the applicable limitations periods when measured from GWG's April 20, 2022 bankruptcy filing. The Complaint also pleads a basis for tolling under the discovery rule and fraudulent concealment doctrine. Whether tolling applies, whether GWG exercised reasonable diligence, and when GWG discovered or should have discovered the alleged fraud are fact-intensive questions inappropriate for resolution on a Rule 12(b)(6) motion. Accordingly, Defendants' Motion to Dismiss on statute of limitations grounds is DENIED.

Finally, the Court finds that the Complaint adequately pleads each element of the RICO claims, the state law claims for aiding and abetting breach of fiduciary duty and civil conspiracy, and the fraud and negligent misrepresentation claims with the particularity required under Rule 9(b). The Defendants' Motion to Dismiss based on the argument that Trustee either pleaded itself out of court or failed to plausibly plead any of its claims is DENIED.

## I.   BACKGROUND

This action is brought by the Trustee on behalf of the GWG Trust, which owns the causes of action belonging to GWG Holdings, Inc. (together, with its wholly owned subsidiaries, "*GWG*"); GWG Life, LLC; GWG Life USA, LLC; GWG DLP Funding IV, LLC; GWG DLP

Funding VI, LLC; and GWG DLP Funding Holdings VI, LLC (collectively, "*Debtors*") or their estates (the "*Estates*"). Dkt. No. 1 at 4. For purposes of the motion to Dismiss, the allegations in the Trustee's Complaint are assumed to be true and are restated herein.

GWG operated in the secondary life insurance business, raising capital through debt financing in the form of "L Bonds" sold to investors through a network of brokers and using that capital to purchase life insurance policies on the secondary market. Dkt. No. 1, ¶ 58. According to the Trustee, GWG became the target of Heppner and The Beneficient Company Group, L.P. ("*BEN LP*," including all affiliates, "*BEN*"), a company Heppner formed in the mid-2010s to serve as a liquidity provider to mid-to-high-net-worth individuals holding alternative assets. Dkt. No. 1, ¶¶ 58–60. The original Heppner/BEN business plan, the Trustee pleads, was for BEN to acquire illiquid alternative assets in exchange for BEN equity in the form of BEN common units. Dkt. No. 1, ¶ 62. But the "business plan was dubious from the start" because there was no market for BEN common units. ECF No. 1, ¶ 63. BEN was a new entity with no operating history or track record of profitability and trading illiquid assets for illiquid assets was not attractive to investors. Dkt. No. 1, ¶ 63. According to the Trustee, Heppner and BEN concocted a scheme to use a middleman to buy alternative assets, settle them in an "Exchange Trust" (also called a "Seller Trust"), and then exchange the economic interests in those assets for BEN common units. The Exchange Trust would then auction the BEN common units in exchange for consideration that the beneficiaries of the trusts—the original sellers of alternative assets—found acceptable. Dkt. No. 1, ¶ 64.

Meanwhile, the Trustee alleges that in September 2017 Heppner caused BEN to incur $141 million of debt (the "*BEN-HCLP First Debt*") to a newly formed Heppner-affiliated entity—HCLP Nominees, LLC ("*HCLP*")—and loaded that debt into BEN's capital stack. Dkt. No. 1, ¶¶ 77–78. At a December 2017 auction of BEN common units, GWG was the successful bidder—perhaps

the only bidder. ECF No. 1 ¶ 70. In January 2018, GWG executed a "Master Exchange Agreement "among GWG Holdings, GWG Life, BEN LP, MHT Financial SPV, L.L.C., and the Seller Trusts, which memorialized GWG's bid: $150 million in cash, $250 million in L Bonds (issued by GWG), and $150 million of GWG common stock. Dkt. No. 1, ¶ 70. A series of "Exchange Transactions" effectuating the agreement followed throughout 2018, the net effect of which was that (i) GWG loaned $192.5 million to BEN pursuant to a Commercial Loan Agreement ("*CLA*") and received approximately 30 million common units of BEN LP; (ii) certain Seller Trusts obtained majority ownership of GWG stock and obtained L Bonds representing $366.9 million in debt owed by GWG to the Seller Trusts; and (iii) BEN obtained equity interests in GWG, and trusts affiliated with BEN ended up with secondary private equity investments. Dkt. No. 1 ¶¶ 70–71. The Trustee does not allege that Banowsky or HK participated in any of the above transactions or negotiations leading to the transactions. Instead, the Trustee alleges that these transactions encumbered GWG with massive debt and equity exposure to BEN, thus "pav[ing] the way for Heppner—with Defendants' advice and assistance—to subsequently exploit GWG for [Heppner's] personal interest." Dkt. No. 1 ¶ 72.

In May 2019, BEN and Beneficient Holdings, Inc.("*BHI*"), Heppner's primary holding vehicle for his interest in BEN, executed a credit agreement (backdated to December 28, 2018) with an initial principal balance of $72 million (the "*BEN-HCLP Second Debt*"). Dkt. No. 1, ¶ 80. Jeffery Hinkle ("*Hinkle*"), a BEN officer, signed this agreement as Secretary of BHI. Dkt. No. 1, ¶ 80.

Beginning in February 2018, BEN entities paid at least $193 million to HCLP as payments of principal, interest, and fees on the BEN-HCLP First Debt, and BEN-HCLP Second Debt. Dkt. No. 1, ¶ 96. The Trustee alleges that in December 2018—before Banowsky's first involvement in the dealings at issue—Heppner "used threats from HCLP to foreclose on the BEN-HCLP First

Debt" to create negotiating leverage. Dkt. No. 1, ¶ 79. The Trustee does not allege that HCLP was threatening to do something it had no legal right to do regarding the debt.  Dkt. No. 29 at 95 (citing Dkt. No. 1, ¶¶ 90–94).

The Trustee, by separate adversary proceeding, filed claims against, *inter alia*, Heppner, BEN, and HCLP.  *See* Adversary No. 24-03090.  The Trustee directs the instant adversary proceeding solely against Banowsky and HK based on the post-Exchange Transaction communications pertaining to HK's client, HCLP from 2019 forward. *See* Dkt. No. 1. Banowsky's first involvement alleged in the Complaint occurred in early 2019, when he wrote a litigation opinion (the "*February 2019 Litigation Opinion*"). Dkt. No. 1, ¶ 6. The opinion was requested because the 2018 Exchange Transactions had created confusion about whether the Seller Trusts needed to be consolidated in BEN's financial statements; as part of its inquiry, BEN's auditor asked whether Beneficient Company Holdings, the primary holding company of BEN's subsidiaries, had the power to remove a trustee of the Seller Trusts.  Dkt. No. 1, ¶¶ 56, 100.  As pled by the Trustee, Banowsky states that his February 2019 Litigation Opinion is based upon factual "information about HCLP's ownership and control structure" provided by BEN's then Chief of Staff, Timothy Evans ("*Mr. Evans*")—information that Banowsky assumed to be true for purposes of the letter. Dkt. No. 1, ¶¶ 100, 114. It is this February 2019 Litigation Opinion that the Trustee describes as the "foundation" for Heppner's fraud.  Dkt. No. 1, ¶ 239.

The Trustee alleges that in March 2019, Banowsky emailed GWG's CFO on behalf of HCLP regarding the BEN-HCLP First Debt.  Dkt. No. 1, ¶ 125. HCLP had offered, based upon information about the status of BEN's audit, to extend the March 31, 2019 maturity of the BEN-HCLP First Debt by one year if the parties could resolve differences over the language of a forbearance agreement. Dkt. No. 1, ¶ 125. Otherwise, Banowsky is alleged to have said, "the senior lender will call its note

on March 31, 2019." Dkt. No. 1, ¶ 125.  As with the prior HCLP "threat" to foreclose, the Trustee does not allege that Banowsky, on behalf of HCLP, was threatening to do something HCLP had no legal right to do regarding the debt. Dkt. No. 29 at 95 (citing Dkt. No. 1, ¶¶ 90–94). Instead, the Trustee's pleaded allegation is that HCLP never would have foreclosed on BEN because HCLP was controlled by BEN's founder and CEO, a fact Banowsky took active steps to hide. *See* Dkt. No. 1, ¶¶ 90–94. Shortly thereafter, the parties to the debt executed an amendment to the BEN-HCLP First Debt Credit Agreement extending the maturity date. Dkt. No. 1, ¶ 133.

The Trustee pleads that in April 2019, Heppner became a GWG director and GWG's chairman of the board. Dkt. No. 1, ¶ 34. Heppner's status with GWG *and* BEN, and the patent conflict of interest it caused, led (a) GWG to form the GWG Special Committee of its two independent directors to approve transactions between GWG and BEN, and (b) BEN to form the "Enterprise Risk Committee" to review BEN's borrowings from HCLP. *See* Dkt. No. 1, ¶¶ 137–38, 157. In May 2019, Mr. Evans again provided HCLP control information—this time in a diagram he prepared for the Special Committee's counsel. Dkt. No. 1, ¶¶ 117, 142. In October 2019, Banowsky agreed to prepare a letter for counsel to the BEN Enterprise Risk Committee "setting out the relationship between BEN, Heppner, and HCLP" (the "*October 2019 Letter*"). ECF No. 1, ¶¶ 11, 156, 167. According to the Trustee, the letter responded to the BEN Enterprise Risk Committee counsel's concerns after reviewing BEN's financials and a desire to "nail[ ] down" statements from BEN's 2018 financial statements disclosing that the HCLP debt is a "related party debt" and Heppner's suggested role as "either an investment trustee" or within "a class of beneficiaries." ECF No. 1, ¶¶ 157, 167, 168. The October 2019 Letter stated that Banowsky reviewed "company agreements of HCLP, CMH, HCLP Credit, HCLP, and HCI" and "[d]ocuments related to the

appointment and resignation of managers of the subject entities" and provided the letter to BEN's management to review "for accuracy." Dkt. No. 1 ¶¶ 174, 188.

The Trustee alleges that the October 2019 Letter contained a number of incorrect and misleading statements, all of which furthered Banowsky and Heppner's fraudulent scheme to defraud and obtain money by means of false pretenses and misrepresentations, to wit: "Heppner cannot control HCLP" because: (a) only Wickline, as manager of HCI "ha[d] the sole authority to remove and replace [CMH] as manager of both [HCLP Credit] and HCLP;" (b) neither "Heppner nor his family have the power to remove and replace the manager of HCI;" and (c) "neither Mr. Heppner nor any member of his Family have the power to remove and replace the manager of [CMH]." Dkt. No. 1, ¶ 188. But those assertions omitted that Heppner: (a)(i) had the power to remove and replace the manager of HCLP and HCLP Credit through his position as trustee of HPHT, which controlled Highland Consolidated's general partner, which indirectly controlled HCLP Credit and HCLP, and (ii) used that power days earlier to change HCLP and HCLP Credit's manager from Highland Counselors to CMH; (b)(i) had the power to replace HCI's manager as trustee of the HPHT, HCI's sole member, and (ii) used that power just days earlier to replace Keith Martens ("*Martens*") with David Wickline ("*Wickline*") as HCI's manager; (c)(i) had the power to change CMH's manager as trustee of the trust that owned CMH, and (ii) used that power days earlier to install Wickline in place of HCIC as CMH's manager. Dkt. No. 1, ¶ 188.

Then, in November 2019, the Trustee alleges Banowsky participated in a call with a lawyer from Foley & Lardner LLP ("*Foley & Lardner*") counsel to the GWG Special Committee, to discuss HCLP's ownership and control structure (the "*November 2019 Call*"). ECF No. 1 ¶¶ 199-200. The alleged acts—Banowsky's (a) communications regarding HCLP's control structure and (b) collection negotiations on behalf of HCLP—form the gravamen of the Trustee's allegation that

Banowsky's false statements about HCLP's control structure and false threats to foreclose on the HCLP debt caused GWG to enter into various financial transactions with BEN "earmarked" for HCLP. *See* Dkt. No. 1 at 4–12.

Sometime in either early 2019 or 2020, the Trustee's Complaint notes, HCLP's deal counsel for the BEN-HCLP First and Second Debts, the Sidley law firm, wrote to GWG's General Counsel seeking a conflict waiver for new representation, stating "we represented HCLP Nominees, LLC . . . which we understand to be controlled by Brad Heppner and Bradley Capital Company, L.L.C., and then Beneficient Holdings, Inc. . . . as lender, in connection with several financing transactions" Dkt. No. 1, ¶ 91, n.8. In February 2021 and again in early March 2021, Banowsky is alleged to have communicated with BEN and GWG Special Committee counsel about the status of the BEN-HCLP debt, but the GWG Special Committee "refused to budge" on further funds for BEN to pay on debt. Dkt. No. 1, ¶¶ 272, 261–69.

In response, it is pleaded, Heppner called a special GWG Board meeting that dissolved the GWG Special Committee and decided that future transactions and funding could proceed without a special committee approval. Dkt. No. 1, ¶ 273. The Complaint alleges no further communication between Banowsky and any specially-formed committee or BEN or GWG regarding HCLP-control structure of the BEN-HCLP Debt after early March 2021.

The Trustee alleges that the Defendants participated in Heppner's fraudulent scheme, which, *inter alia*, induced GWG to (1) wire transfer $49.8 million for BEN to pay HCLP as a purported change-of-control premium, (2) wire transfer $28.2 million directly to HCLP, (3) enter into a Unit Purchase Agreement on unfair terms and provide another $50 million to BEN earmarked for HCLP, and (4) transfer an additional $14.8 million to BEN, by concealing Heppner's relationship with HCLP and making sham payment demands and false representations regarding

HCLP's loans. Dkt. No. 1, ¶¶ 16–19. The Trustee pleads that, of the $300 million GWG transferred to benefit BEN, including $193 million transferred to pay on the BEN-HCLP Debt, the Trustee seeks at least $148,393,211.89 in damages attributable solely to Banowsky and HK "fraudulently induc[ing]" payments on the lawful BEN-HCLP Debt. Dkt. No. 1 ¶¶ 95–96, 388.

On February 28, 2025, the Trustee filed his Complaint, initiating this adversary proceeding. Dkt. No. 1. On June 2, 2025, Defendants filed their instant Motion to Dismiss. Dkt. No. 20. On August 1, 2025, the Trustee filed its "Response in Opposition to Defendants' Motion to Dismiss Complaint for Failure to State a Claim" (the "*Response*"). Dkt. No. 29. On September 26, 2025, Defendants filed their "Reply in Support of Defendants' Motion to Dismiss Complaint for Failure to State a Claim" ("*Reply*"). Dkt. No. 37.

On March 16, 2026, the instant adversary proceeding was assigned to the undersigned. Bankr. Dkt. No. 2831. On June 10, 2026, this Court entertained oral arguments and ordered briefing. The Trustee filed his on post-hearing brief on June 26, 2026. Dkt. No. 48. Defendants filed their post-hearing brief on July 8, 2026. Dkt. No. 49. The Court now issues the instant Memorandum Opinion and accompanying order.

## II.   JURISDICTION, VENUE & CONSTITUTIONAL AUTHORITY

This Court holds jurisdiction pursuant to 28 U.S.C. § 1334 and exercises its jurisdiction in accordance with Southern District of Texas General Order 2012–6. *In re*: *Order of Reference to Bankruptcy Judges*, Gen. Order 2012–6 (S.D. Tex. May 24, 2012). Section 157 allows a district court to "refer" all bankruptcy and related cases to the bankruptcy court, wherein the latter court will appropriately preside over the matter. 28 U.S.C. § 157(a); *see also* In re: Order of Reference to Bankruptcy Judges, Gen. Order 2012-6 (S.D. Tex. May 24, 2012). An adversary proceeding falls within the Court's "related to" jurisdiction if "the outcome of that proceeding could

conceivably have any effect on the estate being administered in bankruptcy." *In re Bass*, 171 F.3d 1016, 1022 (5th Cir. 1999). This Court may only hear a case in which venue is proper. 28 U.S.C. § 1408. 28 U.S.C. § 1409(a) provides that "a proceeding arising under title 11 or arising in or related to a case under title 11 may be commenced in the district court in which such case is pending." Debtor's main case is pending in this Court and therefore, venue of this proceeding is proper.

While bankruptcy judges can issue final orders and judgments for core proceedings, absent consent, they can only issue reports and recommendations on non-core matters. 28 U.S.C. § 157(c). The Court concludes that the claims asserted in the Complaint are non-core claims under 28 U.S.C. § 157. The parties do not consent. Dkt. No. 1, ¶ 25; Dkt. No. 20 at 162. Thus, this Court must evaluate whether it has constitutional authority to enter a final judgment in this case. In *Stern v. Marshall*, 564 U.S. 462 (2011), which involved a core proceeding brought by the debtor under 28 U.S.C. § 157(b)(2)(C), the Supreme Court held that a bankruptcy court "lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim." *Stern v. Marshall*, 564 U.S. 462, 503, (2011). However, *Stern* is inapplicable to the instant case. *Stern* concerned final orders entered by the bankruptcy court and here, the Court need only enter an interlocutory order because motions to dismiss pursuant to Federal Rule of Civil Procedure ("*Rule*") 12(b)(6), like the instant motion filed by Defendants, are interlocutory. Entering an interlocutory order does not implicate "the constitutional limitations on the Court's authority to enter final judgments." *West v. WRH Energy Partners LLC (In re Noram Res., Inc.)*, 2011 Bankr. LEXIS 5183, at *3 (Bankr. S.D. Tex. Dec. 30, 2011). Therefore, this Court need not determine whether it has constitutional authority to enter a final judgment.

### III.   DEFENDANTS' MOTION TO DISMISS

Defendants' Motion to Dismiss seeks dismissal of all claims the Trustee asserts in the Complaint. Dkt. No. 20. The Complaint brings the following causes of action (collectively, the "*Counts*"): Counts I and II – Violations of RICO and RICO conspiracy under 18 U.S.C. §§ 1962(c) and (d); Count III – Aiding and Abetting/Knowing Participation in Breach of Fiduciary Duty by Heppner; Count IV – Civil Conspiracy; Count V – Fraud (November 2019 Call); and Count VI – Negligent Misrepresentation (November 2019 Call). Dkt. No. 1, ¶¶ 375–435.

As a threshold matter, Defendants argue that the Trustee has failed to establish standing to pursue any of the claims asserted in the Complaint. Dkt. No. 37 at 17. Because standing is a prerequisite to the Court's consideration of the merits, the Court addresses Defendants' standing argument first.

### IV.   STANDING

#### 1.   Standard

Upon filing, a Chapter 11 petition "creates an estate comprised of all the debtor's property, including 'all legal or equitable interests of the debtor in property as of the commencement of the case,'" an estate that encompasses causes of action. *Torch Liquidating Trust ex rel. Bridge Assocs. L.L.C. v. Stockstill*, 561 F.3d 377, 386 (5th Cir. 2009) (quoting 11 U.S.C. § 541(a)(1)). The Fifth Circuit, in *United Operating*, held that when a Chapter 11 plan is confirmed, that estate ceases to exist, and the debtor loses its "authority to pursue claims as though it were a trustee," unless the plan preserves its standing to bring such claims. *Dynasty Oil & Gas, LLC v. Citizens Bank* (*In re United Operating, LLC*), 540 F.3d 351, 355 (5th Cir. 2008). To preserve standing, the plan must "expressly retain the right to pursue such actions" and the reservation must be "specific and unequivocal" *Id.* at 355. For a reservation to be effective, it "must be specific and unequivocal" but the "degree of specificity involved in a plan's reservation of claims will often vary." *Wooley v. Haynes & Boone, L.L.P.* (*In re SI Restructuring Inc.*), 714 F.3d 860, 864 (5th Cir. 2013). The Fifth Circuit has also rejected the argument "that if a reorganization plan is ambiguous as to which

claims have been reserved, then the plan per se fails to make a specific and unequivocal reservation." *Compton v. Anderson (In re MPF Holdings US LLC)*, 701 F.3d 449, 455–56 (5th Cir. 2012). Under *United Operating*, neither a blanket reservation of "any and all claims" arising under the Bankruptcy Code, nor a specific reservation of other types of claims under various Bankruptcy Code provisions is sufficient to preserve common-law claims for, *inter alia*, fraud, breach of fiduciary duty, and negligence. *In re United Operating, LLC*, 540 F.3d at 356.

In considering whether a plan adequately reserves a claim, courts may look to both the plan and the disclosure statement to decide whether the post-confirmation debtor has standing. *In re SI Restructuring Inc.*, 714 F.3d at 864. *See also Spicer v. Laguna Madre Oil & Gas II, L.L.C. (In re Tex. Wyo. Drilling, Inc.)*, 647 F.3d 547, 551 (5th Cir. 2011); *In re MPF Holdings US LLC*, 701 F.3d at 457.

Although a plan's retention of claims must be "clear and unequivocal," the Fifth Circuit does not require that defendants be individually identified in the plan. *See Lovett v. Cardinal Health, Inc. (In re Diabetes Am., Inc.)*, 485 B.R. 340, 345, 351 (Bankr. S.D. Tex. 2012). *See also See also Grossman v. Belridge Grp. (In re Lothian Oil, Inc.)*, 531 F. App'x 428, 436 n.9 (5th Cir. 2013) ("While it is true that '[i]f a debtor has not made an effective reservation, the debtor has no standing to pursue a claim that the estate owned before it was dissolved,' it is not necessary that a plan individually identify the parties to be sued."). The Fifth Circuit in *Texas Wyoming* observed "that *In re United Operating* focused exclusively on the retention of claims. It never held that intended defendants must be named in the plan." *In re Tex. Wyo. Drilling, Inc.*, 647 F.3d at 552. Although *Texas Wyoming* found that it "need not decide whether a debtor whose plan fails to identify any prospective defendants has standing to pursue post-conformation claims against subsequently-named defendants," it noted that part of *United Operating*'s holding "supports the . . . argument that a plan need not identify the prospective defendants." In *MPF Holdings*, the Fifth Circuit later interpreted *Texas Wyoming* as rejecting the requirement that "the parties to be sued after confirmation must be individually identified." *In re MPF Holdings US LLC*, 701 F.3d at 455.

The Fifth Circuit teaches that "a reservation of claims is effective if it identifies the nature of the claims reserved and the class of potential defendants against whom those claims might be pursued—a precise identification of each individual potential defendant is unnecessary." *Rossco Holdings, Inc. v. McConnell*, 613 F. App'x 302, 306-07 (5th Cir. 2015).

### 2. The *United Operating* standard does not apply to claims against non-creditors

The threshold question raised by the parties is whether the "specific and unequivocal" retention requirement articulated in *United Operating* applies when a litigation trustee sues non-creditor third parties who had no right to vote on or object to plan confirmation. See Dkt. Nos. 48, 49. The Court concludes it does not.

Defendants argue that this question has already been decided because the Fifth Circuit applied *United Operating* to claims against non-creditors in several decisions. *See* Dkt. No. 49 at 10–11 (compiling cases). However, none of the cases cited by Defendants actually considered the issue of whether a non-creditor exception exists. "[A]ccording to black letter law, 'a question not raised by counsel or discussed in the opinion of the court' has not 'been decided merely because it existed in the record and might have been raised and considered.'" *De La Paz v. Coy*, 786 F.3d 367, 373 (5th Cir. 2015) (citing *United States v. Mitchell*, 271 U.S. 9, 14 (1926)). Only one of the cases Defendants cited, *Alder v. Frost*, even addressed the issue. *Adler v. Frost* (*In re Gulf States Long Term Acute Care of Covington, L.L.C.*), 614 F. App'x 714 (5th Cir. 2015). In *Alder*, the plaintiff, on appeal to the Fifth Circuit, argued that he had standing to pursue his claims because the *United Operating* doctrine does not apply with full force where the debtor's representative sues defendants who were not creditors of the debtor. *Id.* at 718. The Fifth Circuit noted that the plaintiff requested the court "to announce an exception to United Operating that this Court has not previously recognized." *Id.* But the Fifth Circuit stated that it had "no occasion to consider whether such an exception exists because [plaintiff] did not properly raise this argument in the proceedings

below." *Id.* Because the issue was not timely raised by the plaintiff, the court stated that it "will consider only the question preserved for appeal: whether the Plan specifically and unequivocally reserves . . . claims . . . under the traditional *United Operating* framework." *Id.* at 719. The fact that the Fifth Circuit found the argument forfeited does not constitute endorsement of applying *United Operating* to non-creditors; it simply means the court did not address the question. *See De La Paz*, 786 F.3d at 373. Rather, *Alder* confirms that in the Fifth Circuit, there remains an open question of whether a non-creditor expectation to the *United Operating* framework exists. *See Adler*, 614 F. App'x at 718.

Section 1123(b)(3)(B) of the Bankruptcy Code provides that a plan may "provide for . . . the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose," of "any claim or interest belonging to the debtor or to the estate."11 U.S.C. § 1123(b). In *United Operating*, the Fifth Circuit held that for a debtor or litigation trustee to preserve a claim, "the plan must expressly retain the right to pursue such actions" and that "[t]he reservation must be 'specific and unequivocal.'" *In re United Operating*, 540 F.3d at 355. This specificity requirement is a "logical consequence of the nature of a bankruptcy, which is designed primarily to 'secure prompt, effective administration and settlement of all debtor's assets and liabilities within a limited time.'" *Id. United Operating* explained that "[t]o facilitate this timely, comprehensive resolution of an estate, a debtor must put its creditors on notice of any claim it wishes to pursue after confirmation." *Id.* It then concluded that "[p]roper notice allows creditors to determine whether a proposed plan resolves matters satisfactorily before they vote to approve it" and that absent "specific and unequivocal" retention language in the plan, "creditors lack sufficient information regarding their benefits and potential liabilities to cast an intelligent vote." *Id.*

The Fifth Circuit in *Texas Wyoming* later confirmed that the "purpose" of the retention requirement articulated by *United Operating* is to put "creditors on notice of any claim [the debtor]

wishes to pursue after confirmation" and allow "creditors to determine whether a proposed plan resolves matters satisfactorily before they vote to approve it." *In re Tex. Wyo.*, 647 F.3d at 552. Fifth Circuit precedent thus makes clear that the rationale underlying *United Operating* is firmly rooted in creditor rights. This notice-and-voting framework assumes that the party challenging the trustee's standing is a creditor whose treatment under the plan could be affected by retained litigation. *See In re SI Restructuring Inc.*, 714 F.3d at 864 ("Though the degree of specificity involved in a plan's reservation of claims will often vary, the reservation must, at a minimum, be specific enough to put '*creditors* on notice of any claim [the debtor] wishes to pursue after confirmation.'") (emphasis added).

Some courts within the Fifth Circuit have held that the rationale underlying *United Operating* does not apply when a non-creditor challenges a debtor representative's standing. *In re Gulf States Long Term Acute Care of Covington, LLC*, 487 B.R. 713, 725 (Bankr. E.D. La. 2013); *In re Odin Demolition & Asset Recovery, LLC*, 544 B.R. 615, 631 (Bankr. S.D. Tex. 2016). In *Gulf States*, the Bankruptcy Court for the Eastern District of Louisiana distinguished *United Operating*, *Texas Wyoming*, and *MPF Holdings* on the basis that they "involved creditor/defendants rather than third parties." *In re Gulf States*, 487 B.R. at 725. The court reasoned that since specific disclosures of claims against "non creditor parties … do not impact the votes of creditor/defendants," applying the "specific and unequivocal" standard to claims against non-creditors would only allow non-creditors "to gain an advantage by claiming ambiguity exists in the Plan's reservation of claims against them" and in turn, reduce distributions to creditors. *Id.* at 725–26. Accordingly, the *Gulf States* court found that a general reservation of "any and all claims and causes of action" sufficiently reserved claims against the non-creditor defendants. *Id.* at 726. In *Odin Demolition*, the court found "the *Gulf States* rationale to be very persuasive" and "adopt[ed] it in its entirety" to find that a general "any and all causes of action" reservation would be sufficient to reserve claims against non-creditors. *In re Odin Demolition & Asset Recovery, LLC*, 544 B.R. at 629, 631. The court reiterated that *United Operating* and its progeny are rooted

in creditors' "entitle[ment] to know about claims that will be pursued post-confirmation" so they "can adjust [their] vote accordingly." *Id.* at 631 (quoting *Gulf States*, 487 B.R. at 725-26) (cleaned up).

This Court finds the *Odin* and *Gulf States* reasoning persuasive and consistent with the purposes underlying § 1123(b)(3). Section 1123(b) and the *United Operating* framework protect creditors' ability to make informed decisions about plan confirmation. Non-creditors, by contrast, have no vote on the plan, no right to object to confirmation based on plan terms, and no entitlement to notice of retention provisions. *See* 11 U.S.C. § 1125(a). Thus, the rationale of *United Operating*, "disappears entirely . . . when the defendant in a post-confirmation action is not a creditor." *In re Odin Demolition & Asset Recovery, LLC*, 544 B.R. at 631(quoting *Gulf States*, 487 B.R. at 725-26).

The statutory framework confirms this conclusion. Non-creditors are not entitled to notice of the plan confirmation hearing, FED. R. BANK. P. 2002(b), have no voting rights under 11 U.S.C. § 1129, and are generally not considered "parties in interest" with standing to object under § 1128(b). *See In re Cypresswood Land Partners I*, 409 B.R. 396, 413–17 (Bankr. S.D. Tex. 2009). Bankruptcy estates are "administered for the benefit of creditors and the debtor(s), not for the benefit of entities who may owe money to the estate." *In re Miller*, 347 B.R. 48, 52 (Bankr. S.D. Tex. 2006). And § 1123(b) is designed to provide notice to creditors of "assets yet to be liquidated that will be pursued post-confirmation, which is information necessary for the creditors to be able to properly calculate their payout under the proposed plan." *In re Diabetes Am.*, 485 B.R. at 348. Section 1123(b) neither entitles non-creditor potential defendants to specific notice that they may be sued nor protects such potential defendants from claims. *See Blue Water Endeavors, LLC v. AC & Sons, Inc.* (*In re Blue Water Endeavors, LLC*), 2011 Bankr. LEXIS 67, at *18 (Bankr. E.D. Tex. Jan. 6, 2011) ("The purpose [of United Operating] is not to protect all defendants who may

be sued at some future time . . . but to ensure that all creditors, who are considering the acceptance or rejection of a proposed plan of reorganization, are aware of the totality of the estate's assets so that they may vote accordingly."); *In re Tex. Wyo. Drilling, Inc.*, 422 B.R. 612, 627 (Bankr. N.D. Tex. 2010), *aff'd* 647 F.3d 547 (5th Cir. 2011) ("The purpose of the specific and unequivocal language requirement is not to put potential defendants (at least those not voting on the plan) on notice of lawsuits that may be brought against them; rather, it is to put creditors that are entitled to vote on notice that there may be assets in the form of potential lawsuits . . . ."). Accordingly, in the context of claim retention, there is no purpose in allowing non-creditors to benefit from protections intended for creditors, nor is there any legal basis for extending creditor-specific protections under the Bankruptcy Code to non-creditors.

Here, it is undisputed that Defendants Holland & Knight and Banowsky were not creditors of GWG and filed no proofs of claim in the bankruptcy case. They had no right to vote on the plan, no entitlement to distributions, and no basis to object to plan confirmation on the ground that retained claims were insufficiently described. Defendants' status as non-creditors removes this case from *United Operating*'s core concern: protecting creditors' voting rights. *See United Operating*, 540 F.3d at 355.

Accordingly, the Court finds that *United Operating* has no application to the Trustee's claims against non-creditors, Holland & Knight and Banowsky. Here, the Plan contains a blanket reservation of "any claim [or] cause of action . . . pursuant to any [] theory of law," Dkt. No. 41, Ex. 8 at 57; Dkt. No. 41, Ex. 6 at 2, which encompasses the claims being brought against the Defendants. The Court finds that such general reservation is sufficient to retain claims against the non-creditor Defendants, regardless of whether it would meet *United Operating*'s "clear and

unequivocal" standard. The Trustee therefore has standing to pursue all Counts against Defendants.

Defendants' Motion to Dismiss based on standing is therefore DENIED.

## V.    TEXAS ATTORNEY IMMUNITY

Defendants next assert that the Trustee is barred by the Texas common-law doctrine of attorney immunity. Dkt. No. 20 at 54. For purposes of this Motion, the Court accepts as true all well-pleaded factual allegations in the Complaint and draws all reasonable inferences in favor of the Trustee, the non-moving party. Thus, as a threshold matter, the Court must determine whether the Texas immunity doctrine is, on the pleaded facts, a bar to any or all of the claims the Trustee raises.

### A.  Introduction

Texas law has long immunized attorneys from suit by non-clients for actions taken in connection with representing a client. The doctrine stems from the principle that "attorneys are authorized to practice their profession, to advise their clients and interpose any defense or supposed defense, without making themselves liable for damages." *Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477, 481 (Tex. 2015) (citation omitted). The purpose of the doctrine is to ensure "loyal, faithful, and aggressive representation by attorneys employed as advocates" by avoiding "the inevitable conflict that would arise if [they] were 'forced constantly to balance [their] own potential exposure against [their] client's best interest.'" *Id.* (citations omitted). An attorney seeking dismissal based on attorney immunity bears the burden to "conclusively establish that [the] alleged conduct was within the scope of [the attorney's] legal representation of [the] client." *Ironshore Europe DAC v. Schiff Hardin, LLP*, 912 F.3d 759, 763  (5th Cir. 2019). "Although Texas courts occasionally grant attorney immunity at the motion to dismiss stage, in those cases, the scope of

the attorney's representation—and thus entitlement to the immunity—was apparent on the face of the complaint." *Kelly v. Nichamoff*, 868 F.3d 371, 375 (5th Cir. 2017).

### 1.  The "Type of Conduct" test

The critical inquiry is not the *wrongfulness* of the alleged conduct but the *kind* of conduct at issue. *Cantey Hanger*, 467 S.W.3d at 483. Immunity will be forfeited only where the kind of conduct is "entirely foreign to the duties of an attorney." *Id.* at 483, 487. Conduct "foreign" to an attorney does not mean "something a good attorney should not do." *Taylor v. Tolbert*, 644 S.W.3d 637, 646 (Tex. 2022). Instead, "it means that the attorney is acting outside his or her capacity and function as an attorney." *Id.* at 647. Allegations of fraud, even criminal conduct, do not automatically negate immunity. *See Bethel v. Quilling, Selander, Lownds, Winslett & Moser, P.C.*, 595 S.W.3d 651, 657–58 (Tex. 2020). "Merely labeling an attorney's conduct 'fraudulent' does not and should not remove it from the scope of client representation or render it 'foreign to the duties of an attorney.'" *Cantey Hanger*, 467 S.W.3d at 483. But, "[t]he mere fact that an attorney was representing a client at the time of alleged fraudulent activity is not enough to warrant immunity." *Kelly*, 868 F.3d at 375 (applying Texas law).

### 2.  Scope beyond litigation

Attorney immunity extends beyond litigation to transactional and business contexts. *Haynes and Boone, LLP v. NFTD, LLC*, 631 S.W.3d 65, 79 (Tex. 2021) ("[W]e confirm that attorney immunity applies to claims based on conduct outside the litigation context."). *In Haynes and Boone*, the Texas Supreme Court held that "the attorney-immunity defense applies in all adversarial contexts in which an attorney must zealously and loyally represent his or her client, so long as the conduct constitutes the 'kind' of conduct attorney immunity protects." *Id.* at 79–80.

### 3.  Protected Types of Conduct

Conduct relating to legal representation must involve "the unique office, professional skill, training, and authority of an attorney." *In re Uplift RX, LLC*, 667 B.R. 665, 687 (Bankr. S.D. Tex. 2024) (quoting *Haynes and Boone, LLP*, 631 S.W.3d at 78). Texas and Fifth Circuit decisions identify numerous categories of conduct protected by attorney immunity, including: drafting legal opinions and demand letters; negotiating on behalf of a client; advising on corporate structure and governance; responding to regulatory inquiries; participating in client calls and meetings; communicating client positions; reviewing and interpreting legal documents; managing client relationships and conflicts; and coordinating with other counsel. *See Ironshore Europe DAC v. Hardin*, 912 F.3d 759, 767 (5th Cir. 2019); *Troice v. Greenberg Traurig, L.L.P.*, 921 F.3d 501, 506 (5th Cir. 2019); *Youngkin v. Hines*, 546 S.W.3d 675, 684 (Tex. 2018).

## B.  Analysis of the Texas Attorney Immunity doctrine

Defendants contend that all of Banowsky's alleged conduct falls squarely within the types of conduct protected by Texas attorney immunity and that the Complaint must therefore be dismissed in its entirety. Dkt. No. 20 at 54. The Court disagrees. While attorney immunity is a significant protection, it is not a categorical bar that immunizes all conduct merely because it was performed by a lawyer. *See Kelly*, 868 F.3d at 375 (applying Texas law). The Trustee has plausibly alleged facts that, if proved, would demonstrate that Banowsky's conduct was either (1) not within the scope of representation of his purported clients, HCLP and Highland Consolidated; (2) not legal services at all; or (3) undertaken in knowing furtherance of Heppner's fraudulent scheme rather than in discharge of duties owed to HCLP.

The Trustee argues that, as to RICO claims, the state-law doctrine does not ever apply to a federal statutory claim. Dkt. No. 29 at 100.  As to its aiding and abetting breach of fiduciary duty claim, the Trustee argues that Delaware, not Texas, law governs. Dkt. No. 29 at 107–08.  The Trustee

concedes that the existence and bounds of a general attorney immunity defense under federal law are unclear. Dkt. No. 29 at 100.  In any event, the Defendants invoke Texas attorney immunity. Dkt. No. 20. For the reasons stated herein, even assuming Texas attorney immunity applies to all of the Trustee's claims, the Court finds that the alleged facts, if true, could place those claims outside the scope of the doctrine. The Court thus need not decide the choice of law issue at this stage.

## 1. Background

### a. The GWG-BEN relationship and HCLP

In 2018 and 2019, GWG became entangled with BEN, a company founded, controlled, and chaired by Heppner. Dkt. No. 1, ¶¶ 70–71. BEN purportedly owed substantial debts to HCLP under two senior secured credit agreements: the BEN-HCLP First Debt and the BEN-HCLP Second Debt. Dkt. No. 1, ¶¶ 77, 81. The Complaint alleges that HCLP was not a legitimate, arms-length third-party lender but rather a vehicle through which Heppner extracted funds for his own benefit and that of his affiliated trusts and entities (collectively, "*Bradcos*"). Dkt. No. 1, ¶¶ 74, 184, 272. According to the Trustee, Heppner exercised de facto control over HCLP through a complex web of entities and trusts, including Highland Consolidated, LP ("*Highland Consolidated*"), which served as the "effective center" of what the Complaint terms the "Enterprise." Dkt. No. 1 at ¶ 376. Money collected by HCLP was allegedly transferred almost immediately through intermediaries to Highland Consolidated and then "advanced" to Heppner-controlled entities, including his personal residence trust ("*HCLP TC*") and ranch property trust ("*HCLP EBO*"), as well as the Brad Heppner Family Trust, FYI Partners, and HRA. Dkt. No. 1, ¶¶ 356, 376. From 2019 through 2021, GWG advanced at least $148 million to BEN, much of which was earmarked for or paid directly to HCLP under the false impression that HCLP was an independent lender ready to foreclose if not paid. Dkt. No. 1, ¶¶ 2, 388.

### b. Banowsky's alleged role in the fraudulent scheme

Banowsky is a partner at Holland & Knight (formerly Thompson & Knight LLP ("*TK*") prior to an August 2021 merger). Dkt. No. 1, ¶ 29. The Complaint alleges that Banowsky, acting in the course and scope of his employment as an HK partner, served as the architect, spokesperson, and enforcer of the fraudulent scheme. Dkt. No. 1, ¶ 61. The Complaint identifies three principal categories of misconduct:

### i. Backdating and misrepresenting HCLP's control structure

In February 2019, Banowsky drafted the February 2019 Litigation Opinion for BEN's general counsel regarding the power to remove trustees of certain Seller Trusts. Dkt. No. 1, ¶ 100, 101. In the February 2019 Litigation Opinion, Banowsky stated that "[t]he manager of HCI [Highland Consolidated Investments, LLC, HCLP's ultimate controlling entity] since at least September 1, 2017, is an individual named Keith Martens" and that "Martens ultimately controls HCLP Nominees." Dkt. No. 1, ¶¶ 101, 102. The Complaint alleges this statement was false: Heppner, not Martens, was HCI's manager as of February 11, 2019. Dkt. No. 1, ¶ 103. Two days after Banowsky issued the opinion, Heppner asked Martens to sign backdated documents purporting to show that Martens had been HCI's manager since July 2017. Dkt. No. 1, ¶ 103. The Complaint alleges that Banowsky's February 2019 statement "presaged backdated, retroactive changes to HCLP's management and ownership structure that Heppner would make days later," demonstrating that Banowsky coordinated with Heppner and knew of the changes to come. Dkt. No. 1, ¶ 104.

Similarly, in October 2019, after a group of dual GWG-BEN directors began investigating related-party payments, Banowsky and Heppner orchestrated another backdated "restructuring" of HCLP's control structure. Dkt. No. 1, ¶¶ 12, 156. On October 18, 2019, Heppner—in his capacity

as trustee of a trust owning HCI—removed and replaced HCI's manager, the very act Banowsky would days later claim Heppner lacked the power to do. Dkt. No. 1, ¶¶ 7, 42. On October 23, 2019, Banowsky sent the October 2019 Letter to the BEN Enterprise Risk Committee's counsel stating that "Heppner cannot control HCLP" because "[n]either Brad Heppner nor his family have the power to remove and replace the manager of HCI." Dkt. No. 1, ¶ 188. The Trustee alleges that Banowsky knew these statements were false and that he actively assisted Heppner in planning and executing the backdated changes to obscure Heppner's control. Dkt. No. 1, ¶ 357.

      **ii.**    **The November 2019 call: misrepresentations to GWG's special committee counsel**

On or about November 15, 2019, counsel for GWG's Special Committee (Foley & Lardner) called Banowsky to gain comfort that HCLP was "unaffiliated with BEN (i.e., not controlled by Mr. Heppner or other affiliates)" and "that Mr. Heppner otherwise would not have an economic interest in proceeds received by" HCLP. Dkt. No. 1, ¶ 199. According to Special Committee minutes, Banowsky represented during this call (the "*November 2019 Call*") that: (1) "the control structure of the lender (which did not include rights for Mr. Heppner or other affiliates)"; (2) "Mr. Heppner retained solely a limited contingent interest in distributions from the ultimate equity holder in the lender"; and (3) "unequivocally no debt repayment would be received by Mr. Heppner or his affiliates." Dkt. No. 1, ¶¶ 200, 414. The Complaint alleges these statements were false. Dkt. No. 1, ¶¶ 200, 414. Heppner exercised de facto control over HCLP by twice swapping out its managers in 2019, and Banowsky consistently sought direction from Heppner— not the nominal managers—in representing HCLP. Dkt. No. 1, ¶¶ 13, 18. Moreover, Heppner held a 34% stake in HCLP through his personal investment vehicle, BHI, and payments on the BEN-HCLP Second Debt were sent directly or indirectly to Heppner affiliate Bradley Capital through January 2020. Dkt. No. 1, ¶¶ 37, 39. Most significantly, funds transferred to HCLP were almost

immediately moved through intermediaries to Highland Consolidated and then to Heppner's affiliated trusts and entities. Dkt. No. 1, ¶¶ 38, 40. As usual, Banowsky debriefed Heppner after the call, writing that it was "[v]ery high level like the minutes" and that counsel for GWG's Special Committee "did not push me for information" or "ask for any documents or anything in writing." Dkt. No. 1, ¶ 203.

### iii.    Demands for payment and threats of foreclosure

The Complaint alleges that Banowsky, purportedly acting on behalf of HCLP, made strategic demands for payment and threats of foreclosure that he knew HCLP (controlled by Heppner) would never carry out. Dkt. No. 1, ¶ 266. These demands were timed to coincide with negotiations between GWG and BEN and were designed to pressure GWG into transferring funds under unfavorable terms. Dkt. No. 1, ¶ 17, 130. For example, in March 2019, Banowsky wrote to GWG's CFO stating that "the senior lender" would "call its note on March 31, 2019" if a forbearance agreement could not be resolved satisfactorily. Dkt. No. 1, ¶ 125. Banowsky sent the December 2019 Letter demanding a $49.8 million payment to HCLP as a "change of control" premium, threatening default if BEN did not comply. Dkt. No. 1, ¶¶ 207, 217. In February and March 2021, Banowsky sent additional letters (the "*February 2021 Letter*" and "*March 2021 Letters*") stating that "HCLP's present intention is to not grant any further extensions of the Loan" and that "HCLP Nominees intends to pursue its rights on the due date under the Secured Credit Agreements, including the right to foreclose on its collateral." Dkt. No. 1, ¶¶ 261, 259, 269. The Complaint alleges that Banowsky knew HCLP would never foreclose because Heppner controlled HCLP and would never destroy BEN, his "brainchild." Dkt. No. 1, ¶ 18. Yet Banowsky made these threats anyway to "browbeat GWG's decision-makers into approving transactions with BEN on terms demanded by Heppner." Dkt. No. 1, ¶ 15.

iv.   **Alleged harm to GWG**

The Trustee alleges that as a direct result of Defendants' conduct, GWG was fraudulently induced into advancing approximately $148 million to BEN between December 2019 and March 2021, nearly half of which was earmarked for or paid directly to HCLP. Dkt. No. 1, ¶ 4, 388. Had GWG known the truth about Heppner's control over and benefit from HCLP, it would not have transferred these funds or would have negotiated substantially better terms. Dkt. No. 1, ¶ 223. GWG received BEN equity interests in exchange for these transfers, which the Complaint alleges are "essentially worthless." Dkt. No. 1, ¶ 296.

2.   **Defendants have not met their burden to establish immunity at the pleading stage**

As an initial matter, the Court emphasizes that Defendants bear the burden of establishing entitlement to attorney immunity. *Kelly*, 868 F.3d at 375. At the motion to dismiss stage, this is a "heavy burden." *See id.* at 376. Texas courts grant attorney immunity at the motion to dismiss stage only in rare instances where "the scope of the attorney's representation—and thus entitlement to the immunity—[i]s apparent on the face of the complaint." *Id.* at 375. Here, far from being "apparent on the face of the complaint," the scope of Banowsky's representation and whether his conduct served his clients' interests are contested factual questions requiring development beyond the pleadings. The Complaint alleges that Banowsky purported to represent HCLP and Highland Consolidated but in reality took direction from Heppner, a non-client, and acted to further Heppner's interests rather than those of his nominal clients. *See* generally Dkt. No. 1. These allegations, if true, would place Banowsky's conduct outside the protection of attorney immunity.

a.   **The Complaint plausibly alleges conduct outside the scope of representation**

The Trustee alleges that Banowsky's conduct was not undertaken to discharge duties owed to HCLP or Highland Consolidated but rather to further Heppner's fraudulent scheme. Specifically, the Complaint alleges:

### i. Banowsky took direction from Heppner, not his clients

Throughout the relevant period, Banowsky allegedly sought instruction and approval from Heppner—not from HCLP's nominal managers (Martens, Hinkle, or Wickline)—in representing HCLP. For example, in January 2019, when asked whether HCLP would waive a conflict, Banowsky wrote "I will check with my client" and then emailed *Heppner* (not Hinkle or Martens, HCLP's managers at the time) to ask whether HCLP would agree to the waiver. Dkt. No. 1, ¶ 91. After the November 2019 Call with GWG's Special Committee counsel, Banowsky debriefed *Heppner*—not HCLP's manager—about the call. Dkt. No. 1, ¶ 203. The Complaint alleges dozens of similar instances in which Banowsky coordinated with, sought permission from, and reported to Heppner regarding HCLP matters. These allegations support a plausible inference that Banowsky was not representing HCLP's interests but rather serving as Heppner's agent in perpetuating the false impression that HCLP was independent. *See Ridgeway v. MedFinManager*, *LLC*, 716 S.W.3d 937, 948 (Tex. App. 2025) (noting that the question of whether there is an "existence of an attorney-client relationship at the time of the attorney's complained of conduct" is "factual in nature").

### ii. Banowsky's conduct did not benefit his clients

The Complaint alleges that the restructurings Banowsky orchestrated and the statements he made regarding HCLP's control structure did not benefit HCLP or Highland Consolidated but instead served only to obscure Heppner's control while allowing him to retain it. *See* Dkt. No. 1, ¶¶, 4– 13.  If Trustee's allegations are true, the "benefit" to HCLP and Highland Consolidated from

these changes was solely that they might mislead GWG and BEN directors into believing Heppner lacked control, thereby increasing the likelihood GWG would earmark funds for HCLP. *See* Dkt. No. 1, ¶¶, 4– 13.

If Banowsky had truly sought to maximize HCLP's interests, the Complaint suggests, he would have advised HCLP to sever *all* ties with Heppner and provide GWG with a complete and accurate picture of HCLP's ownership and control. Dkt. No. 1, ¶ 352. Doing so would have genuinely assuaged concerns about related-party transactions and increased the likelihood of payment without requiring deception. Dkt. No. 1, ¶ 352. Instead, Banowsky allegedly helped Heppner engineer half-measures that obscured but did not eliminate Heppner's control, then gave incomplete and misleading information to GWG's board. Dkt. No. 1, ¶ 353. Moreover, HCLP itself retained none of the funds it received; all payments were immediately transferred upstream to Highland Consolidated and then to Heppner's Bradcos. Dkt. No. 1, ¶ 351. These facts, if true, support the Trustee's allegation that Banowsky's acted to serve Heppner's extraction scheme, not to provide legal services in aid of HCLP's legitimate business interests.

### iii.    HCLP had separate deal counsel

The Complaint alleges that HCLP retained Sidley Austin LLP ("*Sidley*")—not Banowsky or HK—as its transactional counsel for negotiating, modifying, and documenting the BEN-HCLP credit agreements. Dkt. No. 1, ¶ 354. Banowsky himself admitted in correspondence that he "did not have original copies of many of the loan documents" and that "neither TK nor [Banowsky] were lead lawyers on the negotiation and drafting of the Credit Agreement." Dkt. No. 1, ¶¶ 157, 354. By late 2021, Banowsky had to coordinate with his son (then working in BEN's legal department) to track down copies of loan-related documents and again acknowledged that Sidley had served as HCLP's transactional counsel "from the beginning through at least August 2020."

Dkt. No. 1, ¶ 354. These allegations support the inference that Banowsky was not acting as HCLP's zealous transactional advocate but rather as Heppner's tool to "peddle half-truths and outright misrepresentations." *Id.*

Defendants argue that the Trustee's allegations amount to impermissible "pretext" inferences that the Court must disregard under *Iqbal*. Dkt. No. 20 at 77. But the Complaint does far more than ask the Court to infer pretext from ambiguous facts. It alleges specific, repeated instances of Banowsky coordinating with Heppner rather than HCLP's managers, making statements that concealed Heppner's control, and engineering changes that served only to perpetuate Heppner's ability to extract funds. At the pleading stage, these allegations are sufficient to raise a plausible inference that Banowsky's conduct exceeded the scope of representation.

### iv.    The Complaint plausibly alleges acts that were not legal services

Attorney immunity protects only conduct that involves "the office, professional training, skill, and authority of an attorney." *Landry's, Inc. v. Animal Legal Def. Fund*, 631 S.W.3d 40, 47 (Tex. 2021). Conduct is not protected "simply because attorneys often engage in that activity" or because an attorney performed it on a client's behalf. *Taylor*, 644 S.W.3d at 646. The Complaint alleges several categories of conduct that do not require legal training or skill:

#### 1.  Service as Trustee

Banowsky served as trustee of the Great Plains Trust, Dkt. No. 1, ¶ 53, Harmon Trust, Dkt. No. 1, ¶ 52, Highland Management Trust ("*HMT*"), Dkt. No. 1, ¶ 43, and Highland Property Holdings Trust ("HPHT"), Dkt. No. 1, ¶ 284,—four trusts at the top of the Enterprise's structure. Dkt. No. 1, ¶ 376. These trusteeships were not legal services; they were fiduciary positions. Legal training is not required for the role. *See* Dkt. No. 1, ¶¶ 52–53, 284, 379. Defendants concede that an attorney serving in a non-lawyer role may serve as a "single fact 'most important' to the [attorney immunity] analysis" and that "analysis of whether all, or just some, of [the attorney's]

conduct is protected is obscured" in such cases. Dkt. No. 20 at 64–65. In *In re Uplift*, the court denied a motion to dismiss where the defendant attorney "served on [the] board of directors during the scheme" and provided assistance on "extra-legal matters like business decisions that do not involve the traditional skills of an attorney." *In re Uplift Rx*, 667 B.R. at 688. Here, as in *Uplift*, Banowsky's service as trustee of entities within the alleged Enterprise requires denial of the Motion to Dismiss insofar as claims rest on that conduct.

### 2. Coordinating backdated corporate restructurings

The Complaint alleges that Banowsky helped Heppner plan and execute backdated changes to HCLP's management and ownership structure in February 2019, fall 2019, and June 2021. Dkt. No. 1, ¶¶ 6, 103–06, 153–56, 164–69, 283–85, 291. While corporate lawyers often assist with restructurings, the Complaint alleges that these particular restructurings served no legitimate corporate purpose and were designed solely to obscure Heppner's control.

Defendants argue that "backdating" corporate documents is routine and permissible. Dkt. No. 20 at 73, 74. That may be true when documents are backdated to memorialize an event that actually occurred on the stated date. But the Complaint alleges *fabrication*—creating documents that purport to reflect events that never occurred in order to mislead third parties. Dkt. No. 1, ¶¶ 6, 103–06, 153–56, 164–69, 283–85, 291. For example, the February 2019 Litigation Opinion stated that Martens had been HCI's manager since at least September 1, 2017. Dkt. No. 1, ¶ 102. But as of the date of the February 2019 Litigation Opinion, Heppner, not Martens, was HCI's manager. Dkt. No. 1, ¶ 103. And two days after Banowsky delivered the February 2019 Litigation Opinion, Heppner asked Martens to sign three backdated signature pages to HCLP-related organizational documents that made it appear that Martens—not Heppner—had served as HCI's manager since July 2017. Dkt. No. 1, ¶ 103. At the motion to dismiss stage, the Court must accept the Trustee's

characterization. Whether the backdating was permissible memorialization or fraudulent fabrication is a factual question that cannot be resolved on the pleadings.

### 3. Demands for payment

Defendants argue that making demands for payment on behalf of a client is quintessentially lawyerly conduct. Dkt. No. 20 at 69. But the Complaint alleges that Banowsky's demands were not genuine efforts to collect on behalf of HCLP but rather strategic threats designed to pressure GWG into capitulating to Heppner's terms, knowing that HCLP (controlled by Heppner) would never actually foreclose. Dkt. No. 1, ¶¶ 73–79, 124–26. The alleged falsity of the threats takes them outside the protection of the doctrine. A lawyer who threatens litigation on behalf of a client to collect a legitimate debt is immune from suit even if the threat is aggressive. But a lawyer who makes threats he knows are false and will never be carried out—not to serve the client's interests but to extort concessions for a third party—is not engaged in protected advocacy. *See JJJJ Walker, LLC v. Yollick*, 447 S.W.3d 453, 469 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (holding that "duty not to intentionally or recklessly make false statements for the purpose of fraudulently inducing another to enter a contract is not a duty of care that is owed only by attorneys in the provision of legal services").

### v. The Complaint plausibly alleges fraud, which is conduct foreign to the duties of an attorney

While Texas law does not recognize a categorical "fraud exception" to attorney immunity, it has long held that conduct "entirely foreign to the duties of an attorney" is unprotected. *Cantey Hanger*, 467 S.W.3d at 483. Fraud committed in furtherance of a client's scheme—as opposed to zealous advocacy that a disappointed adversary labels fraudulent—falls into this category. In *Cantey Hanger*, the Texas Supreme Court emphasized that courts must not evaluate the *wrongfulness* of conduct but only the *kind* of conduct. *Id.* at 482. But the Texas Supreme Court

also made clear that there is "a wide range of criminal conduct that is not within the 'scope of client representation' and [is] therefore 'foreign to the duties of an attorney.'" *Taylor*, 644 S.W.3d at 648 (quoting *Bethel v. Quilling, Selander, Lownds, Winslett & Moser*, *P*.C, 595 S.W.3d 651, 658 (Tex. 2020). It has been held that an attorney who "knowingly commits a fraudulent act that injures a third person, or . . . knowingly enters into a conspiracy to defraud a third person" is not immune. *Likover v. Sunflower Terrace II, Ltd.*, 696 S.W.2d 468, 472 (Tex. App.—Houston [1st Dist.] 1985). And more than a century ago, the Texas Supreme Court recognized that when an attorney, while representing a client, participates in fraudulent conduct, such conduct is "foreign to the duties of an attorney." *See Poole v. H. & T. C. R'y Co.*, 58 Tex. 134, 137–38 (1882). The Fifth Circuit applied this principle in *Kelly v. Nichamoff*, 868 F.3d 371 (5th Cir. 2017), affirming denial of a motion to dismiss where the complaint alleged that the defendant attorney "fraudulently manipulate[d] [the company's] shares, falsely assured [plaintiff] that she was purchasing shares sufficient to give her 50% ownership, withheld and concealed information that would have revealed the fraud, and falsely represented the value of the shares." *Kelly*, 868 F.3d at 373. The Fifth Circuit held that these alleged actions of the attorney "constitute[d] fraud independent of [defendant's] duties as an attorney and would not qualify as 'acts taken and communications made to facilitate the rendition of legal services to [the client].'" *Id.* at 375–76. Here, the Complaint alleges far more than aggressive advocacy or zealous representation that an adversary labels fraudulent. It alleges a multi-year scheme involving:

a. **Knowing misrepresentations of material fact**: Banowsky allegedly stated that Martens was HCI's manager "since at least September 1, 2017" when Heppner was in fact the manager, and that "Heppner cannot control HCLP" when Heppner had just exercised that control days earlier. Dkt. No. 1, ¶¶ 11, 6.

b. **Coordination with a non-client to deceive third parties**: Banowsky allegedly coordinated with Heppner to plan backdated restructurings, then made statements to GWG's board and auditors that concealed those restructurings and misrepresented

HCLP's independence. Dkt. No. 1, ¶¶ 10, 11.

c. **Participation in accounting fraud**: The Complaint alleges that Banowsky was "a willing participant in accounting fraud" by "conceal[ing] the extent of Heppner's relationship with HCLP in financial statements that Banowsky and Heppner knew would be shared with, and relied upon, by GWG." Dkt. No. 1, ¶ 116.

d. **False threats of foreclosure**: Banowsky allegedly made repeated threats that HCLP would foreclose on BEN, knowing that Heppner (who controlled HCLP) would never carry out those threats. Dkt. No. 1, ¶ 93.

These allegations, if proved, would demonstrate fraud independent of and foreign to Banowsky's duties as an attorney. The Court in *Kelly* emphasized that "independently fraudulent conduct is 'foreign to the duties of an attorney' and falls outside the scope of client representation." *Kelly*, 868 F.3d at 376. The Complaint alleges specific factual predicates for fraud: false statements of material fact, knowledge of falsity, intent to induce reliance, actual reliance, and resulting harm. At the pleading stage, these allegations are sufficient.

vi.     **Defendants' reliance on categorical immunity for "kinds of conduct" fails**

Defendants present a detailed chart categorizing all of Banowsky's alleged conduct into twelve "kinds of conduct" they contend are categorically immune. The chart includes: (A) drafting and sending legal opinions and communications; (B) representing clients in negotiations and loan transactions; (C) providing legal advice on corporate structure and governance; (D) responding to regulatory inquiries; (E) participating in client calls and meetings; (F) communicating client positions; (G) reviewing and interpreting legal documents; (H) client management and communications; (I) advising on conflicts of interest; (J) coordinating with other counsel; (K) facilitating corporate and trust restructuring; and (L) serving as trustee. Dkt. No. 20 at 67–72. This approach misapprehends the attorney immunity analysis.

Defendants' chart treats each category of conduct as categorically immune without regard to the factual allegations surrounding that conduct. But Texas law does not grant blanket immunity to

all "opinion letters" or all "negotiation" simply because those activities can be legitimate legal services. The immunity analysis requires examining whether the particular conduct alleged—in its full factual context—was undertaken in discharge of duties owed to the client or was instead conduct foreign to those duties. For example, Defendants list "drafting and sending legal opinion letters" as categorically immune conduct. Dkt. No. 20 at 68. But *what* the opinion letter says, *to whom* it is directed, and *for what purpose* it was prepared all matter because these considerations determine whether the attorney's actions were within the scope of his representation, an essential element of the attorney immunity defense. *See Haynes & Boone*, 631 S.W.3d at 77, 80 (examining whether attorney's conduct were "outside the scope of representation").

Moreover, as explained *supra*, several categories of conduct Defendants list as immune are not legal services at all or are alleged to have been performed outside the scope of representation:

1. **Service as trustee** (Category L): This is a fiduciary role, not a legal service.

2. **Backdating documents to fabricate a false history** (Category K): While lawyers may assist with corporate restructurings, knowingly backdating documents to create a false paper trail is not a legitimate legal service.

3. **Taking direction from a non-client**: Throughout the Complaint, the Trustee alleges that Banowsky took instruction from Heppner rather than from HCLP's managers. This is not "client management" (Category H). Rather, it is abandonment of the client in favor of a third party's interests.

Finally, and most fundamentally, Defendants' chart obscures the central allegation: that Banowsky was not acting as HCLP's zealous advocate but as Heppner's co-conspirator. *See generally* Dkt. No. 1. Even if an activity—such as drafting a demand letter—is generally the type of conduct lawyers perform, it may lose immunity protection if undertaken to perpetrate fraud or assist a third party's scheme rather than to serve the client's legitimate interests. *Likover*, 696 S.W.2d at 472;  Poole, 58 Tex. at 137–38; *Kelly*, 868 F.3d at 375–76. As explained *supra*, the Complaint alleges that Banowsky's opinion letters, demand letters, and communications were not prepared

to advance HCLP's legitimate business interests but to perpetuate Heppner's fraudulent extraction scheme. If proved, this would take the conduct outside the immunity doctrine.

Defendants rely heavily on *Ironshore Europe DAC v. Schiff Hardin, LLP*, 912 F.3d 759 (5th Cir. 2019), for the proposition that the Court must "look[] beyond [the Trustee's] characterization of the firm's conduct as wrongful . . . [to] the type of conduct at issue" and reject legal conclusions that the conduct was "separate from [the attorney's] representation." Dkt. No. 37 at 35. But *Ironshore* is distinguishable. There, an excess insurer sued defense counsel for the underlying tort defendant, alleging that the firm's reporting on the litigation led it "to believe that the suit posed no threat of exposure to its policy." *Ironshore*, 912 F.3d at 762. The Fifth Circuit held that the firm's conduct—reporting settlement discussions, giving opinions on claim strength and valuation, and providing estimates of potential liability—fell within protected attorney conduct. *Id.* at 767. Critically, the *Ironshore* court did not question whether the defense firm was actually representing its client's interests or whether it had abandoned its client to serve a third party. *See id.* Here, by contrast, the Trustee alleges that Banowsky was *not* representing HCLP's interests at all but was instead using his position as HCLP's counsel as a cover to further Heppner's fraud. Dkt. No. 1.  The Trustee does not merely argue that Banowsky's communications were wrongful; the Trustee alleges that Banowsky was serving the wrong master, and offers specific allegations for support. Dkt. No. 1. The allegations, if proved, would take the case outside *Ironshore*'s holding.

### 3.  Conclusion as it pertains to Attorney Immunity

Texas attorney immunity is an important protection that serves vital public policies. But it is not a license for fraud. When a complaint plausibly alleges that an attorney has abandoned his client's interests to participate in a third party's fraudulent scheme, the immunity doctrine does not bar suit. Here, the Trustee has alleged facts that, if proved, would demonstrate that Banowsky: (i)

took direction from Heppner, a non-client, rather than from HCLP's managers; (ii) made knowing misrepresentations about HCLP's ownership and control structure; (iii) coordinated with Heppner to engineer backdated restructurings designed to deceive GWG; (iv) made false threats of foreclosure to pressure GWG into unfavorable transactions; (v) served as trustee of trusts within the alleged Enterprise (a non-legal role); and (vi) acted to further Heppner's fraudulent extraction scheme rather than to serve HCLP's legitimate interests. These allegations are sufficient to survive dismissal at the pleading stage. Defendants have not met their heavy burden to establish entitlement to immunity on the face of the Complaint. For the foregoing reasons, Defendants' Motion to Dismiss on attorney immunity grounds is DENIED.

## VI.    STATUTE OF LIMITATIONS

Defendants next present the argument that all claims are time-barred under applicable statutes of limitations. Dkt. No. 20 at 81. GWG filed its bankruptcy petition on April 20, 2022, which tolls limitations under 11 U.S.C. § 108(a) for claims not already barred as of that date. Bankr. 22-90032 Dkt. No. 1. The Trustee asserts that the parties entered into four tolling agreements, with the operative agreement tolling all statutes of limitations from April 15, 2024, through March 1, 2025. Dkt. No. 1, ¶ 368. Statute of limitations is an affirmative defense for which the defendant has the burden of proof. *Petrobras Am., Inc. v. Samsung Heavy Indus. Co.*, 9 F.4th 247, 254 (5th Cir. 2021). A Rule 12(b)(6) dismissal based on limitations is proper only when the complaint makes plain on its face that the claim is time-barred and raises no basis for tolling. *Id.* at 253. Even if limitations appears to bar a claim, dismissal is improper if the complaint raises factual issues regarding accrual or tolling that cannot be resolved on the face of the pleadings. *Id.*

There is a four-year limitations period for civil RICO claims which begins to run pursuant to the "injury discovery rule." *Rotella v. Wood*, 528 U.S. 549, 552, 554 (2000). Under this injury

discovery rule, a civil RICO claim accrues when the plaintiff discovers, or should have discovered, the injury—not when the plaintiff discovers the pattern of racketeering activity or the identity of all wrongdoers. *Id.* at 553, 556; *Lewis v. Danos*, 83 F.4th 948, 955 (5th Cir. 2023). When a pattern of RICO activity causes a continuing series of separate injuries, the separate accrual rule allows a civil RICO claim to accrue for each injury when the plaintiff discovers, or should have discovered, that injury. *Lewis*, 83 F.4th at 955. Texas fraud claims also use a four-year statute of limitations period, which starts to run when the plaintiff (1) "discovers or should have discovered, in the exercise of reasonable care and diligence, the nature of the injury," or (2) "had knowledge of such facts as would cause a reasonably prudent person to make an inquiry that would lead to discovery of the cause of action." *Petrobras Am., Inc.*, 9 F.4th at 253. For negligent misrepresentation claims under Texas law, a two-year statute of limitations applies. *Tex. Am. Corp. v. Woodbridge Joint Venture,* 809 S.W.2d 299, 302, 567 (Tex. App. 1991). The claim generally accrues when the plaintiff suffers legal injury, which, in the context of faulty professional advise, occurs when the advice is taken or relied upon. *Weaver & Tidwell, L.L.P. v. Guarantee Co. of N. Am. USA*, 427 S.W.3d 559, 567 (Tex. App. 2014). In Texas, the discovery rule is "a very limited exception to statutes of limitations" that "defers accrual of a cause of action until the plaintiff knew or, exercising reasonable diligence, should have known of the facts giving rise to the cause of action." *Id.* at 565.

Defendants argue that all claims are time-barred either under a two-year limitations period or under a four-year limitations period with accrual allegedly occurring in early 2018. Dkt. No. 20 at 81. The Court addresses each argument in turn.

1. **RICO and RICO Conspiracy Claims (Counts I and II)**

Defendants contend that the RICO claims accrued in January or February 2018 when GWG first invested in BEN and took on exposure to the BEN-HCLP debt. Dkt. No. 20 at 96. Defendants assert that because GWG knew of Heppner's relationship with HCLP from public filings, and because GWG's alleged injury stemmed from the 2018 investment decision, limitations expired in January or February 2022—before GWG's April 20, 2022, bankruptcy filing. Dkt. No. 20 at 88–89, 91, 95–96.  The Court rejects this argument.

The RICO claim does not accrue until the plaintiff discovers or should have discovered the injury. *Rotella*, 528 U.S. at 555. The Complaint alleges that the injury to GWG resulted from specific transfers made between May 2019 and March 2021, totaling at least $148,393,211.89 earmarked for or paid directly to HCLP in reliance on Banowsky's misrepresentations. Dkt. No. 1, ¶¶ 387–88. The Trustee does not seek damages for GWG's initial 2018 decision to invest in BEN; rather, the damages model is explicitly limited to funds transferred to BEN for payment to HCLP during the 2019–2021 period based on false representations that HCLP was independent of Heppner. Dkt. No. 1, ¶¶ 387–88, 393–94.

The Complaint identifies specific predicate acts occurring after 2018, including the February 2019 Litigation Opinion, Dkt. No. 1, ¶ 101, the October 2019 Letter, Dkt. No. 1, ¶ 11, the November 2019 Call, Dkt. No. 1, ¶ 199, the December 2019 Letter, Dkt. No. 1, ¶ 217, and the February 2021 Letter, Dkt. No. 1, ¶ 261 and March 2021 Letter. Dkt. No. 1, ¶ 270. Each of these communications allegedly induced subsequent transfers. The May 2019 loan approval ($65 million), Dkt. No. 1, ¶ 143, the December 2019 Transaction ($79 million with $49.8 million earmarked for HCLP), Dkt. No. 1, ¶¶ 206, 220, the July 2020 UPA funding ($61 million), Dkt. No. 1, ¶ 393, and the March 2021 funding ($14.8 million), Dkt. No. 1, 259, all post-date the alleged misrepresentations upon which the Trustee relies.

When a pattern of RICO activity causes a continuing series of separate injuries, a civil RICO claim accrues for each injury when the plaintiff discovers or should have discovered that injury. *Lewis*, 83 F.4th at 955. The Complaint alleges multiple discrete injuries—each transfer of funds earmarked for HCLP—resulting from an ongoing pattern of misrepresentations. The earliest such transfer alleged in the damages model occurred in May 2019, well within four years of the April 20, 2022 bankruptcy filing. Dkt. No. 1, ¶ 143. Defendants' argument that GWG "knew" in 2018 that Heppner controlled HCLP, Dkt. No. 20 at 91, fails for multiple reasons. First, the Complaint alleges that in 2019, Banowsky and Heppner orchestrated backdated restructurings specifically designed to create the false appearance that HCLP had come under independent control. Dkt. No. 1 , ¶ 6. GWG's 2019 Form 10-K reflects this purported change, stating that HCLP was "under the control of a third party who is independent and unrelated to" Heppner. Dkt. No. 1, ¶ 12. This representation, which the Trustee alleges was false and induced by Defendants' conduct, directly contradicts Defendants' assertion that GWG continuously knew of Heppner's control. Second, even if GWG had some awareness of Heppner's historical relationship with HCLP, the Complaint alleges that GWG did not discover the full extent of Heppner's ongoing control, the backdating scheme, or the flow of funds through Highland Consolidated to Bradcos until after bankruptcy. Dkt. No. 1, ¶ 356. The discovery rule inquiry focuses on when the plaintiff knew or should have known of the injury. *Petrobras Am.*, 9 F.4th at 253. Given the facts plead in the Complaint, the exact timing of when GWG knew or should have known of its alleged injuries are fact-intensive determinations inappropriate for resolution on a Rule 12(b)(6) motion.

### a. Fraudulent concealment and the discovery rule

Defendants argue that even if the discovery rule might apply, the Complaint's tolling allegations are conclusory and defeated by GWG's public filings and by judicial estoppel based on

the Trustee's allegations in a separate adversary proceeding against Foley & Lardner. Dkt. No. 20 at 81. The Court finds these arguments premature. The discovery rule and fraudulent concealment doctrine involve fact-intensive inquiries into what the plaintiff knew, when it knew it, and whether reasonable diligence would have uncovered the fraud. *See Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 195 (1997). The Complaint alleges that Defendants "consistently and falsely" portrayed HCLP as independent, orchestrated backdated restructurings to obscure Heppner's control, and made affirmative misrepresentations to GWG's Special Committee and its counsel. Dkt. No. 1, ¶¶ 363–37. These allegations, if proven, would support tolling.

The fraudulent concealment doctrine, which can be used to defeat a statute of limitations defense, requires due diligence by the plaintiff. *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 195(1997). But *Klehr* does not hold that a plaintiff must plead specific investigative steps at the complaint stage to invoke fraudulent concealment. The Complaint here alleges that GWG's directors and Special Committee made multiple attempts to investigate HCLP's relationship with Heppner, including retaining independent counsel in fall 2019, but were "stymied by Banowsky's backdated changes, misrepresentations, and misleading statements." Dkt. No. 1, ¶¶ 357. Whether these efforts constitute reasonable diligence is a factual question unsuitable for resolution on the pleadings.

As to the 2018 and 2019 public filings, Defendants contend that these disclosures gave GWG constructive notice of Heppner's control. Dkt. No. 20 at 81. The Court disagrees. According to Defendants, the 2018 Form 10-K disclosed that HCLP is "directly or indirectly associated with" Heppner and that its limited partners included trusts for which Heppner served as investment trustee. Dkt. No. 20 at 90. But the Complaint alleges that Banowsky made later efforts to mislead GWG and others regarding Heppner's relationship with HCLP after those financial statements were prepared. Specifically, it is alleged that Banowsky made repeated false statements about HCLP's ownership

and control structure to GWG and BEN directors, auditors, lawyers, and others, including in the February 2019 Litigation Opinion, October 2019 Letter, and November 2019 Call. Dkt. No. 1, ¶¶100-01, 118-20, 187-88, 200-01.  Moreover, as reflected in the Trustee's detailed Complaint and related pleadings, the question of Heppner's control over HCLP and Highland Consolidated is a complex one. The 2018 Form 10-K's disclosure that Heppner is, among other things, related to or associated with HCLP does not, on its face, rebut the Trustee's allegation that Banowsky assisted Heppner in a complex scheme to conceal the full extent of Heppner's control over HCLP and his intent to transfer funds paid by GWG to related Bradcos. In this case, Defendants have not carried their burden to establish on the face of the pleadings that no tolling applies.

### b.  Judicial estoppel

Regarding judicial estoppel, Defendants cite allegations in the Trustee's complaint against Foley & Lardner in Adversary Proceeding Case No. 24-03199 (the "*Foley Litigation*"), asserting that Foley & Lardner was negligent in failing to scrutinize the December 2019 Transaction. Dkt. No. 20 at 53. Defendants argue this is inconsistent with the Trustee's position here that GWG acted with due diligence. Dkt. No. 20 at 53. The argument fails. The Trustee's claims against Foley & Lardner rest on Foley & Lardner's professional duties as counsel to the Special Committee. The Trustee's claims here rest on Defendants' affirmative misrepresentations and fraudulent concealment. There is no inherent contradiction in asserting both that Defendants fraudulently concealed material facts and that Foley & Lardner negligently failed to uncover them. Moreover, judicial estoppel requires that the party succeeded in convincing the court to accept the prior inconsistent position. *Hall v. GE Plastic Pac. PTE, Ltd.*, 327 F.3d 391, 396 (5th Cir. 2003). But Defendants have not shown that a court has accepted the Trustee's allegations and arguments in the Foley Litigation as true for purposes of rendering judgment.

### 2. Aiding and Abetting Breach of Fiduciary Duty (Count III)

Defendants argue that the aiding and abetting claim, if subject to a four-year statute of limitations, accrued in 2018 and expired. Dkt. No. 20 at 94. The Court disagrees for the same reasons discussed above. The Complaint alleges that Heppner's breaches of fiduciary duty to GWG occurred when he caused GWG to transfer funds to BEN for payment to HCLP based on false pretenses. *See* Dkt. No. 1, ¶ 397. These transfers occurred between 2019 and 2021. Banowsky's alleged knowing participation in these breaches—through the February 2019 Litigation Opinion, the October 2019 Letter, the November 2019 Call, and subsequent communications—also occurred during this period. Aiding and abetting is a derivative claim that takes the statute of limitations of the underlying tort. *Gandy v. Williamson*, 634 S.W.3d 214, 241 (Tex. App.—Houston [1st Dist.] 2021). Here, the underlying breaches of fiduciary duty are alleged to have occurred between 2019 and 2021, all within four years of the April 2022 bankruptcy filing. The discovery rule and fraudulent concealment may further toll limitations for the reasons already discussed.

### 3. Civil Conspiracy (Count IV)

The civil conspiracy claim is likewise derivative and takes the limitations period of the underlying tort. *Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 138, 144 (Tex. 2019). Because the Complaint bases the conspiracy claim on fraud, which has a four-year limitations, and because the fraudulent acts are alleged to have occurred between 2019 and 2021, the claim is timely. *See id.* at 139. Defendants' argument that the "object" of the conspiracy was formed in 2018, Dkt. No. 37 at 105, conflates the existence of a scheme with the injury that is caused by it. The statute of limitations runs from the occurrence of the injury, not from the formation of a conspiratorial agreement. *See Sorrow v. Harris Cty. Sheriff*, 622 S.W.3d 496, 502 (Tex. App.—Houston [14th

Dist.] 2021) ("Generally, in the context of a tort, [a cause of action accrues] when a wrongful act causes an injury.").

### 4. Fraud (Count V)

The fraud claim arises solely from the November 2019 Call and the December 2019 Transaction that followed. Dkt. No. 1 at 153. Under Texas law, when the discovery rule applies, a fraud claim accrues when the plaintiff discovers or should discover the fraud. *Seureau v. ExxonMobil Corp.*, 274 S.W.3d 206, 228 (Tex. Civ. App.—Houston [14th Dist.] 2008). The November 2019 Call occurred in November 2019; the resulting $49.8 million payment to HCLP occurred on December 31, 2019. *See* Dkt. No. 1, ¶¶ 14 Even without tolling, the four-year limitations period would not expire until December 31, 2023—well after GWG's April 20, 2022 bankruptcy filing. Defendants argue that GWG "knew" the truth because the 2018 Form 10-K disclosed Heppner's association with HCLP. Dkt. No. 37 at 67. But the Complaint alleges that Banowsky affirmatively misrepresented during the November 2019 Call that "the control structure of the lender . . . did not include rights for Mr. Heppner or other affiliates" and that "unequivocally no debt repayment would be received by Mr. Heppner or his affiliates." Dkt. No. 1, ¶ 13. If these representations were false— and the Court must accept that allegation as true at this stage—then GWG's reliance was induced by fraud, not negated by prior disclosures that Defendants' own conduct had rendered obsolete or misleading.

### 5. Negligent Misrepresentation (Count VI)

The negligent misrepresentation claim is subject to a two-year statute of limitations. *Tex. Am. Corp. v. Woodbridge Joint Venture*, 809 S.W.2d 299, 302 (Tex. App.—Fort Worth [2nd Dist.] 1991). The negligent misrepresentation claim arises from the same November 2019 Call. The injury occurred on December 31, 2019, when GWG transferred $49.8 million. *See* Dkt. No. 1, ¶

14. Absent tolling, the two-year period would expire on December 31, 2021—before GWG's April 20, 2022 bankruptcy filing. The Trustee invokes both the discovery rule and fraudulent concealment. The discovery rule applies when the injury is inherently undiscoverable and objectively verifiable. *Seureau*, 274 S.W.3d at 228. The Complaint alleges that GWG could not discover Heppner's control over HCLP through reasonable diligence because Defendants orchestrated backdated restructurings and made affirmative misrepresentations to conceal it. Dkt. No. 1, ¶¶ 356–59. Whether this renders the injury "inherently undiscoverable" is a fact question. Under the fraudulent concealment doctrine, "when a defendant has fraudulently concealed the facts forming the basis of the plaintiff's claim, [a statute of] limitations does not begin to run until the [plaintiff], using reasonable diligence, discovered or should have discovered the injury." *Quiroz v. Hernandez*, 163 F.4th 222, 230 (5th Cir. 2025) (applying Texas law). The Complaint alleges that Defendants continued to conceal Heppner's control even after the de-coupling in May 2021, including Banowsky's February 2022 letter to GWG claiming that HK had only represented GWG in "a limited number of matters" and had not provided advice regarding recent disclosures. Dkt. No. 1, ¶ 318. These allegations, if proven, support tolling through at least early 2022.

In this case, the Court cannot resolve on a Rule 12(b)(6) motion whether the discovery rule or fraudulent concealment applies. These doctrines turn on what GWG knew, when it knew it, and what it should have known through reasonable diligence—all fact-intensive inquiries. *See Petrobras Am., Inc.*, 9 F.4th at 254. The Complaint sufficiently pleads a basis for tolling. Defendants argue that GWG's loss "attached" in 2018 when it entered the Master Exchange Agreements and thereby assumed exposure to the BEN-HCLP debt. Dkt. No. 20 at 134. This argument mischaracterizes both the Complaint and the applicable law. The Complaint does not seek damages for GWG's 2018 decision to invest in BEN. It seeks damages for specific transfers made between 2019 and 2021 in

reliance on specific misrepresentations. The damages model is linked to approximately $148 million earmarked for or paid directly to HCLP during this period. Dkt. No. 1, ¶¶ 387, 388. Whether GWG's broader investment in BEN was wise or prudent is irrelevant; the alleged fraud concerns the subsequent extraction of funds for HCLP's benefit based on false assurances of HCLP's independence.

### 6. Defendants' economic duress recharacterization argument fails

Defendants argue that the Trustee's fraud-based claims should be recharacterized as economic duress claims subject to a two-year statute of limitations. Dkt. No. 20 at 92–94. The argument is legally incorrect. Under Texas law, economic duress requires: (1) a threat to do something the threatening party has no legal right to do; (2) illegal exaction or fraud; and (3) imminent restraint destroying free agency without present means of protection. *Wright v. Sydow*, 173 S.W.3d 534, 544 (Tex. App.—Houston [14th Dist.] 2004, pet. denied). Defendants assert that because the BEN-HCLP debt was lawful and HCLP had a legal right to enforce it, any claim based on "threats to foreclose" must sound in economic duress, not fraud. Dkt. No. 25 at 95. This argument conflates the enforceability of the BEN-HCLP debt with the falsity of representations about who controlled HCLP. The Trustee does not allege that HCLP lacked a legal right to enforce the debt. The Trustee alleges that Defendants falsely represented that HCLP was independent of Heppner, that Heppner would not benefit from payments to HCLP, and that HCLP's demands were those of a third-party lender engaging in arm's-length negotiations. *See generally* Dkt. No. 1. These are allegations of fraud, not economic duress. And although a plaintiff cannot circumvent a statute of limitations through "artful pleading," a court cannot recharacterize well-pleaded fraud claims as a different tort to impose a shorter limitations period. *King v. Otasco, Inc.*, 861 F.2d 438, 441 (1988). The underlying nature of the claim controls, but that inquiry focuses on the elements the plaintiff

must prove, not on the defendant's preferred characterization. Here, the Trustee must prove misrepresentation, scienter, reliance, and causation—the elements of fraud. *Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 153 (Tex. 2015). The fact that the misrepresentations occurred in the context of debt collection does not convert fraud into economic duress to invoke Defendants' preferred statute of limitations period.

### 7.   The Complaint pleads tolling with sufficient specificity

Defendants argue that the Complaint's tolling allegations are conclusory and lack factual support. Dkt. No. 37 at 47. The Court disagrees. The Complaint alleges that GWG's Special Committee retained independent counsel in fall 2019 to investigate HCLP's relationship with Heppner; that Banowsky provided misleading information in response; that GWG's auditors and directors made multiple inquiries; and that Defendants responded with backdated restructurings and false assurances of independence. Dkt. No. 1 at 59, ¶ 154–73. These are factual allegations, not legal conclusions. Defendants argue that specific investigative steps must be pleaded. *See* Dkt. No. 37 at 47 –50. Although the plaintiff must ultimately prove due diligence, there is no requirement that the complaint enumerate every investigative step taken. *See Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 194 (1997). The Complaint alleges facts supporting the conclusion that reasonable diligence would not have uncovered the fraud: HCLP's ownership structure was opaque and involved multiple layers of private entities; Banowsky controlled the information about that structure; Banowsky affirmatively misrepresented key facts; and Banowsky orchestrated backdated transactions specifically to obscure Heppner's control. Whether these allegations ultimately establish tolling is a question for later proceedings, but they are sufficient to survive a motion to dismiss.

### 8.   Conclusion as to the statute of limitation defense

For the foregoing reasons, Defendants have not carried their burden to establish on the face of the pleadings that the Trustee's claims are time-barred. Accordingly, Defendants' Motion to Dismiss on statute of limitations grounds is DENIED.

### VII.   FAILURE TO STATE A CLAIM

Defendants seek dismissal of the Complaint for failure to state a claim under Rule 12(b)(6).

### A.   Applicable standards under Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff's complaint must clear two hurdles. First, the complaint must describe the claim in enough detail to give fair notice of the claim and the grounds for it. *See* FED. R. CIV. P. 8(a) (made applicable by FED. R. BANKR. P. 7008). "[A] formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Specifics are unnecessary, but some facts must support each element. *Id.* Second, the complaint must state a claim "plausible on its face," *Id.* at 570, meaning the plaintiff's right to relief must rise above a "speculative level." *Id.* at 555. Rule 8(a)(2) requires a plaintiff to plead "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). The Supreme Court held that Rule 8(a)(2) requires that "the well-pleaded facts . . . permit the court to infer more than the mere possibility of misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting Rule 8(a)(2)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 557).

Motions to dismiss are disfavored and thus, rarely granted. *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 570 (5th Cir. 2005). When considering a motion to dismiss under Rule

12(b)(6), courts accept well-pleaded allegations as true and liberally construe the complaint in favor of the plaintiff. *Id.* "In determining whether a plaintiff's claims survive a Rule 12(b)(6) motion to dismiss, the factual information to which the court addresses its inquiry is limited to the (1) the facts set forth in the complaint, (2) documents attached to the complaint, and (3) matters of which judicial notice may be taken under Federal Rule of Evidence 201." *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019). "[I]t is clearly proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record." *Norris v. Hearst Tr.*, 500 F.3d 454, 461 n. 9 (5th Cir. 2007). Furthermore, pursuant to Rule 10(c), exhibits attached to a complaint are part of the complaint for all purposes and the Court may consider the exhibits as part of the complaint for purposes of a Rule 12(b)(6) motion. *United States ex rel. Riley v. St. Lukes Episcopal Hosp.*, 355 F. 3d 370, 375 (5th Cir. 2004). And although this Court "will not 'strain to find inferences favorable to the plaintiff[],'" *Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353, 361 (5th Cir. 2004), the facts need only be sufficient "for an inference to be drawn" that the elements of the claim exist. *Walker v. South Cent. Bell Tel. Co.*, 904 F.2d 275, 277 (5th Cir. 1990).

Fraud claims must, in addition, meet Rule 9(b)'s heightened pleading requirements. Under Rule 9(b), fraud claims must be alleged with particularity concerning the circumstances of the fraud. FED. R. CIV. P. 9(b). *See Oppenheimer v. Prudential Sec. Inc.*, 94 F.3d 189, 195 (5th Cir.1996). "To plead fraud adequately, the plaintiff must 'specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent.'" *Sullivan v. Leor Energy, LLC*, 600 F.3d 542, 551 (5th Cir. 2010) (quoting *ABC Arbitrage v. Tchuruk*, 291 F.3d 336, 350 (5th Cir.2002)).

The Court determines, that for purposes of resolving the instant Motion to Dismiss, it is appropriate to take judicial notice, as requested, of: (1) GWG 2018 Form 10-K and Consolidated

Financial Statement, attached to Defendants' motion as Exhibit B; (2) GWG 2019 Form 10-K and Consolidated Financial Statement, attached to Defendants' motion as Exhibit C; and (3) the Trustee's Complaint against Foley & Lardner in Adversary Proceeding Case No. 24-03199, attached to Defendants' motion as Exhibit D. Dkt. No. 20, Exs. 2,3,4. The Trustee objects that these materials cannot be considered to establish an affirmative defense. Dkt. No. 29 at 50–53, 149 n.31. The objection misapprehends the use to which the materials are put. The Court takes notice of the existence and contents of GWG's own public filings—what they disclosed and when—and of the positions the Trustee has taken in its own pleading against Foley & Lardner, not of the truth of any disputed matter asserted within them. *Norris v. Hearst Tr.*, 500 F.3d at 461 n.9; *Petrobras Am., Inc.*, 9 F.4th at 255 (per curiam) (proper to consider a plaintiff corporation's own SEC filings on Rule 12(b)(6) review because the company "prepared the SEC filings" and "so they are relevant to [the company's] knowledge of the statements in the documents").

## B.  Count I: Civil RICO (18 U.S.C. § 1962(c))

To prevail on his civil RICO claim, the Trustee must adequately plead that the Defendants engaged in "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Molina-Aranda v. Black Magic Enters., L.L.C.*, 983 F.3d 779, 784 (5th Cir. 2020). As explained below, the Trustee plead sufficient facts for each element of his civil RICO claim.

### a.  The RICO claims are not barred by the PSLRA

The Defendants assert that the Private Securities Litigation Reform Act ("*PSLRA*") bars the civil RICO claims because GWG's investments in BEN constitute securities purchases under federal law. Dkt. No. 20 at 99. PSLRA bars RICO claims based on "any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section

1962." 18 U.S.C. § 1964(c); *Affco Investments 2001, L.L.C. v. Proskauer Rose, L.L.P.*, 625 F.3d 185, 189 (5th Cir. 2010).

But the Complaint pleads facts, that if true, could demonstrate that any sale of securities was only incidental to the fraud scheme. Here, the fraud underlying the RICO claim concerns the ownership and control structure of HCLP and Highland Consolidated, not any part of BEN, its financial condition, or any characteristic of its equity or debt. *See* Dkt. No. 1, ¶ The alleged facts could show that that Heppner's scheme was a means to obtain money from GWG; no aspect of the scheme related to or required securities specifically. Indeed, the scheme to extract money from GWG by misrepresenting Heppner's controls over entities could have been perpetrated in connection with the sale of any assets. *See e.g.*, *Menzies v. Seyfarth Shaw LLP*, 197 F. Supp. 3d 1076, 1116 (N.D. Ill. 2016) ("This same scheme could have been perpetrated in connection with the sale of any asset: a piece of real estate, a piece of art, or any other conceivable property interest…."), *aff'd in relevant part*, 943 F.3d 328, 333-36 (7th Cir. 2019). And according to the Complaint, Banowsky characterized transfers pursuant to a July 2020 agreement as GWG "advanc[ing] cash to Ben for its operations pursuant to a pre-existing credit facility," not investments in BEN or purchases of securities. Dkt. No. 1, ¶ 313. Moreover, at least part of the alleged scheme occurred after GWG made initial equity investments into BEN. The allegation that Heppner's fraud was based on conduct occurring after GWG's initial investment in BEN support that the scheme could not have "been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962." 18 U.S.C. § 1964(c). In any event, the facts alleged create at least a disputed complex fact issue of whether the alleged scheme would fall within the ambit of PSLRA and is therefore not appropriate for resolution at the motion to dismiss stage.

**b. The Complaint adequately pleads an association-in-fact enterprise**

The Complaint alleges facts sufficient to establish an association-in-fact enterprise under the RICO statute. 18 U.S.C. § 1962. An association-in-fact enterprise requires a group of persons or entities associated together for a common purpose of engaging in a course of conduct, with an ascertainable structure distinct from the pattern of racketeering activity. *United States v. Turkette*, 452 U.S. 576, 582–83 (1981). The Complaint identifies a long-running network of trusts and entities centered on the scheme to defraud GWG. This network includes HCLP Nominees, LLC (the purported senior lender), Highland Consolidated, L.P. (the central entity formed in 1996), HCLP Credit (intermediary entity), BHI (Heppner's personal investment vehicle), HCI (Highland Consolidated's general partner), CMH (manager of HCLP and HCLP Credit), multiple trusts (Harmon Trust, Great Plains Trust, HPHT, HMT), and Bradcos (entities for Heppner's personal benefit). The Complaint alleges that Banowsky, Heppner, and other participants were associated in fact through their coordinated roles in advancing the scheme over an extended period from 2019 through 2021 and beyond. *See generally* Dkt. No. 1.

The common purpose of the enterprise was to induce GWG to transfer large sums under false pretenses regarding the lender's independence and control, while concealing that the lender was controlled by and benefitted the founder. The Complaint establishes longevity and structure through allegations of repeated communications spanning multiple years, including letters, emails, and calls containing false statements about control and benefit, threats of foreclosure, and concealment in regulatory responses. This pattern of sustained coordination among the network of entities and participants demonstrates an ascertainable structure distinct from the predicate acts themselves. The enterprise operated across state lines, with Delaware entities managing Texas property, managers located in different states (Martens in Kansas, Wickline in California), and retention of counsel in multiple states (Milbank in Washington D.C., Sidley in California and

Illinois), satisfying the interstate commerce requirement. *See* Dkt. No. 1, ¶ 378. The Enterprise is distinct from the alleged perpetrators because it comprises the network of trusts and entities that existed as separate legal and functional entities, while Banowsky and Heppner are alleged to have been involved in the operation and management of this enterprise.

### c.   The Complaint pleads a pattern of racketeering activity

The Complaint alleges a pattern of racketeering activity consisting of related predicate acts spanning multiple years.  "Racketeering activity" encompasses acts or threats involving specified state-law crimes, acts indictable under various specified federal statutes, and certain federal offenses. 18 U.S.C. § 1961(1). The statute also provides that a "pattern" requires at least two acts of racketeering activity occurring within a ten-year period. 18 U.S.C. § 1961(5); *H. J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 232(1989).  The predicate acts alleged in the Complaint are related because they all serve the common purpose of the scheme: inducing GWG to transfer funds by misrepresenting the lender's independence and concealing its control by the Heppner. The acts demonstrate continuity through their repetition over an extended period and their coordination toward the same fraudulent objective. The Complaint identifies multiple categories of predicate acts occurring from 2019 through 2021: Wire fraud predicates involving repeated false statements in letters, emails, and calls regarding the lender's independence and control, including the February 2019 Litigation Opinion, March 2019 Emails, October 2019 Letter, November 2019 Call, December 2019 Letter, February 2021 Letter, and March 2021 Letters; Wire fraud predicates involving threats of foreclosure communicated to induce GWG's continued transfers; Obstruction predicates involving concealment in regulatory responses, specifically the February 2021 response to SEC subpoena containing incomplete and misleading information; and Money laundering predicates involving the routing of funds through intermediary entities (HCLP to HCLP Credit to

Highland Consolidated) to a central slush fund and onward to Heppner-controlled entities. *See e.g.*, Dkt. No. 1, ¶¶ 101, 11, 199, 217, 261, 270. These acts occurred repeatedly and continuously as part of the scheme's execution, satisfying the pattern requirement. The scheme continued through 2024, with Highland Consolidated making additional advances to Bradcos, demonstrating both closed-ended continuity (multiple related acts over substantial period) and open-ended continuity (threat of continued activity). *See* Dkt. No. 1, ¶¶ 326, 327.

### d.   Defendants' participation in operating or managing the enterprise

"'[T]o conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must participate in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993). The Complaint alleges facts demonstrating that Banowsky participated in operating or managing the enterprise in a manner that goes substantially beyond providing routine legal services. The allegations include: drafting independence letters designed to create false appearances of lender independence, including the February 2019 Litigation Opinion and October 2019 Letter, Dkt. No. 1, ¶¶ 116, 156, orchestrating backdated governance changes to manipulate the enterprise's structure and decision-making, including replacing Martens as manager with backdated documents and timing restructurings to investigations, Dkt. No. 1, ¶¶ 156, 165, acting as the mouthpiece for threats of foreclosure to induce GWG's continued transfers, including the March 2019 Emails, February 2021 Letter, and March 2021 Letters, *See* Dkt. No. 1, ¶¶ 101, 11, 199, 217, 261, 270, 379, coordinating directly with Heppner to direct the Enterprise's affairs, including seeking direction and approval from Heppner, engaging in debriefing calls, and drafting documents to support a predetermined narrative, Dkt. No. 1, ¶18, and later serving as trustee of the Harmon and Great Plains Trusts (the ultimate owners

of Highland Consolidated), providing ongoing control and management of enterprise assets. Dkt. No. 1, ¶¶ 51–53.

These allegations demonstrate that Banowsky was not merely providing legal advice but were actively directing and controlling the Enterprise's operations. The drafting of false independence letters and orchestration of backdated governance changes are particularly probative of participation in directing the Enterprise's affairs, as they involve affirmative steps to manipulate the Enterprise's structure and create false appearances to third parties. The allegation that Banowsky acted as the mouthpiece for threats of foreclosure further demonstrates their role in executing the scheme's core fraudulent purpose.

### e.   Causation and injury are plausibly alleged

The Complaint traces a clear causal chain from the alleged misrepresentations to GWG's transfers and ultimate injury. The Complaint alleges that GWG's Special Committee relied on the false statements regarding lender independence in approving the transfers. Dkt. No. 1, ¶¶ 93, 123. Specifically, GWG transferred money to BEN specifically to pay HCLP under false pretenses that: (1) BEN needed the money in order to avoid a catastrophic default on the BEN-HCLP First and Second Debts; and (2) the money would not go to benefit Heppner. *See, e.g.*, Dkt. No. 1, ¶387. As a result of Banowsky's misrepresentations, GWG was fraudulently induced into agreeing to send $49.8 million to BEN that BEN would then pay to HCLP. Dkt. No. 1, ¶¶207-09, 420, 424. According to the Complaint, GWG would not have sent money to BEN and would not have allowed BEN to pay that money to HCLP had GWG's Special Committee known the truth about Heppner's affiliation with and control over HCLP. *See* Dkt. No. 1, ¶ 154.  The Complaint alleges that funds, including the $49.8 million payment, were routed through intermediary entities to Highland Consolidated and onward to Heppner-controlled entities, demonstrating that the

payments ultimately benefitted Heppner rather than serving the legitimate purposes represented to GWG. Dkt. No. 1, ¶¶ 376, 383. The Complaint alleges that GWG suffered near-total loss because the equity received in exchange had minimal value. Dkt. No. 1, ¶¶ 154, 328. The causal chain is plausibly alleged: the false statements regarding lender independence and control induced GWG's approvals and transfers; the transfers were routed to Heppner-controlled entities; and GWG received equity of minimal value in return, resulting in substantial loss. This satisfies the pleading-stage requirement for alleging causation and injury under the applicable standards.

## C.  Count II: RICO Conspiracy Claim

To sufficiently plead a RICO conspiracy, the plaintiff must allege that the defendant "has knowledge of the essential nature of the plan." *United States v. Posada-Rios*, 158 F.3d 832, 858 n.10 (5th Cir. 1998) (citations omitted).  At the pleading stage, it is not necessary show that the defendant "knew all of the details of the unlawful enterprise or the number or identities of all the co-conspirators." *Id.* at 858.

### a.  The Complaint pleads a meeting of the minds and Defendant's knowledge

The Complaint alleges facts demonstrating knowledge by Banowsky that his acts were in furtherance of the fraudulent scheme of the enterprise. The pleaded facts show repeated coordination inconsistent with independent action or routine representation. First, the Complaint alleges that Banowsky repeatedly sought direction and approval from Heppner, engaged in debriefing calls with Heppner, and drafted documents designed to support a predetermined narrative of independence and control. *See e.g.*, Dkt. No. 1, ¶¶ 161, 187. These allegations of coordinated drafting and communication, rather than independent legal judgment, plausibly suggest an agreement to participate in the Enterprise's affairs in concert with the Heppner's objectives. Second, the Complaint alleges that Banowsky participated in governance restructurings

that were timed to investigations and designed to obscure Heppner's control. *See e.g.*, Dkt. No. 1, ¶¶ 225, 353. The timing and purpose of these restructurings, as pleaded, are inconsistent with routine corporate governance advice and instead suggest coordinated action to conceal the true nature of the Enterprise from GWG and other third parties. Third, the Complaint alleges that Banowsky used threats and demands as leverage to induce GWG approvals. *See e.g.*, Dkt. No. 1, ¶ 380.  The use of hollow foreclosure threats and manufactured demand letters, coordinated with the Heppner's objectives, plausibly demonstrates an agreement to employ predicate acts of wire fraud (through misrepresentations to GWG) to advance the Enterprise's scheme. These allegations of repeated, coordinated conduct go well beyond mere parallel business behavior and would show that Banowsky had "knowledge of the essential nature of the plan." *Posada-Rios*, 158 F.3d at 858 n.10 (citations omitted).

These same allegations also demonstrate a meeting of the mind between Heppner and Banowsky. Banowsky turned to Heppner, who Banowsky represented could not control HCLP, for direction in representing HCLP: Banowsky accepted line edits from Heppner in documents purporting to lay out HCLP's ownership and control structure, asked Heppner whether HCLP would be willing to waive potential conflicts, coordinated a restructuring of managers and management entities to obscure Heppner's control, worked with Heppner to backdate documents making those management changes, and used HCLP's debt for negotiating leverage, among other things, to further the alleged scheme of extracting money from GWG through the use of predicate acts, such as wire fraud. *See, e.g.*, Dkt. No. 1, ¶¶91, 104, 105, 108, 119, 153, 156, 175, 267, 293, 305, 353.

### D.  Count III: Aiding And Abetting Breach Of Fiduciary Duty

As an initial matter, the parties disagree on whether Texas or Delaware law applies to the Trustee's claims for aiding and abetting a breach of fiduciary duty. *See* Dkt. No. 29 at 107. In any event, the Trustee's claim for aiding and abetting a breach of fiduciary duties survive the motion to dismiss stage even if, as Defendants argue, Texas law applies.

To establish liability for aiding and abetting a breach of fiduciary duty, a plaintiff must plead the existence of a fiduciary duty owed by the primary actor to the plaintiff, a breach of that fiduciary duty by the primary actor, the defendant's knowledge of the fiduciary relationship and his knowing participation of the breach, and damages resulting from the breach. *See Darocy v. Abildtrup*, 345 S.W.3d 129, 138 (Tex. App.—Dallas [5th Dist.]  2011); *Kastner v. Jenkens & Gilchrist, P.C.*, 231 S.W.3d 571, 580 (Tex. App.—Dallas [5th Dist.] 2007).

### a.  Heppner owed fiduciary duties to GWG

Heppner, by serving as GWG's chair and director from April 2019 through June 2021, occupied a position that imposed fiduciary duties to GWG. *See* Dkt. No. 1, ¶ 396. Directors and officers of a corporation owe fiduciary duties of loyalty and care to the corporation. *Gen. Dynamics v. Torres*, 915 S.W.2d 45, 49 (Tex. App.— El Paso [8th Dist.] 1995) The Trustee has plausibly alleged that Heppner breached his fiduciary duties through conduct designed to benefit himself and his affiliates at GWG's expense. Specifically, as explained more fully *supra*, the Trustee alleges that Heppner steered GWG to approve transactions that funneled money to a lender and onward to founder-controlled or founder-benefitting entities, used GWG's capital-raising machinery to fund BEN on terms unfavorable to GWG, and extracted change-of-control and extension payments that benefited himself rather than GWG. These allegations, if proven, would constitute a breach of Heppner's duty of loyalty, as they demonstrate self-dealing and the diversion of corporate assets for personal benefit.

b.  **Defendants' knowledge of the fiduciary relationship and knowing participation of breach**

The Trustee has plausibly alleged that Banowsky possessed knowledge of both the fiduciary relationship and Heppner's breach. A prima facie case of knowledge of the fiduciary relationship and breach may be inferred through circumstantial evidence. *See Straehla v. Al Glob. Servs., LLC*, 619 S.W.3d 795, 809 (Tex. App.—San Antonio [4th Dist.] 2020). The allegations establish that Banowsky maintained a long-standing relationship with Heppner dating back to at least 2003 and engaged in direct communications with him regarding the transactions, Banowsky was aware of the control structure through which Heppner benefitted from the transactions, and Banowsky understood the routing of funds from GWG through the lender to Heppner-affiliated entities. Dkt. No. 1, ¶¶61, 158, 162-63, 370-72.

The Trustee has plausibly alleged that Banowsky provided substantial assistance to the Heppner's breach through multiple forms of conduct as explained *supra*: drafting and disseminating control structure opinions and letters that characterized the control structure in ways that obscured Heppner's actual control and benefit, thereby facilitating the concealment of the breach from GWG's other stakeholders; providing oral assurances to GWG's committee counsel regarding the independence and propriety of the transactions, thereby lending credibility to the founder's representations and reducing scrutiny of the transactions; making threats of foreclosure against GWG, which pressured GWG's decision-makers to approve the unfavorable transactions to avoid default; facilitating backdated governance changes, thereby obscuring the timeline and nature of the transactions and making it more difficult for GWG's stakeholders to understand what had occurred; assuming later trustee roles, suggesting an ongoing involvement in GWG's affairs and a continuing relationship with Heppner that supports an inference of substantial assistance and knowing participation of breach. The conduct alleged here—concealing Heppner's control and

benefit, pressuring decision-makers through threats, and facilitating the obscuring of governance changes—clearly had a material effect on Heppner's ability to accomplish the breach.

Accordingly, the facts alleged in the Complaint are sufficient to plead that Banowsky had knowledge of Heppner's fiduciary duty and that Banowsky knowingly assisted Heppner in breaching that duty.

### c.  Causation and damages

The Trustee's allegations establish a causal connection between Banowsky's assistance and the harm to GWG. By assisting in the concealment of Heppner's control and benefit, pressuring GWG's decision-makers, and facilitating the obscuring of governance changes, Defendants enabled Heppner to cause GWG to approve transactions that diverted GWG's assets to Heppner and his affiliates. The damages alleged—the unfavorable terms of the BEN funding and the improper payments—flow directly from Banowsky's substantial assistance to the breach.

### E.  Count IV: Civil Conspiracy

To state a civil conspiracy claim under Texas law, a plaintiff must establish the following essential elements are: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983) The Complaint alleges Banowsky and Heppner had a meeting of the minds to deceive GWG about Heppner's affiliation with HCLP. The Complaint alleges this is evidenced by their coordination on strategic decisions, Banowsky's seeking of direction from Heppner, and their joint efforts to restructure entities and manufacture false documents. They shared the objective to deceive GWG about Heppner's affiliation with HCLP, fraudulently lead GWG to believe HCLP was not under

Heppner's control, and induce GWG to send money to BEN for payment to HCLP. Dkt. No. 1, ¶¶91, 104, 105, 108, 119, 153, 156, 175, 267, 293, 305, 353.

The Complaint alleges numerous overt acts in furtherance of the conspiracy, including drafting the February 2019 Litigation Opinion with false statements, sending the March 2019 Emails with false threats of foreclosure, drafting the October 2019 Letter with multiple false statements, making false oral representations during the November 2019 Call, drafting the December 2019 Letter manufacturing a false demand, drafting the February 2021 Letter with false threats, drafting the March 2021 Letters with false threats and misrepresentations, backdating organizational documents, and restructuring entities to obscure Heppner's control. The Complaint alleges damages of at least $49.8 million due to Heppner's scheme.

### F.  Count V: FRAUD

To state a fraud claim under Texas law, a plaintiff must plead a material representation that is false, either known to be false when made or asserted without knowledge of its truth, intended to be relied upon, actually and justifiably relied upon, and caused injury. *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001). Rule 9(b) requires that fraud be pleaded with particularity. FED. R. CIV. P. 9(b).

The Complaint adequately pleads fraud with particularity. The Trustee pleaded that on November 15, 2019, a telephone call between Banowsky and Foley & Lardner, GWG's Special Committee counsel, contains the following specific misrepresentations: (a) the control structure of HCLP did not include rights for Heppner or other affiliates; (b) Heppner retained solely a limited contingent interest in distributions from the ultimate equity holder in HCLP; (c) Heppner otherwise would not have an economic interest in proceeds received by HCLP and  unequivocally no debt repayment would be received by Heppner or his affiliates and (d) the Harmon Trust was controlled

by and established for the benefit of the Harmon family. Dkt. No. 1, ¶414. The Complaint pleads that these statements were false because Heppner had functional control of HCLP by virtue of his position as Trustee of the HPHT, HMT, Harmon Trust, and Great Plains Trust; Heppner was the manager of HCI at the time the BEN-HCLP First and Second Debts were incurred; Heppner exercised de facto control over HCLP—twice swapping out its managers in 2019; Banowsky sought instruction from Heppner, not Wickline, Martens, or Hinkle, in representing HCLP and BEN, controlled by Heppner, controlled HCLP's bank account. Dkt. No. 1, ¶415. The Complaint pleads specific facts to demonstrate Banowsky's knowledge of the falsity. For example, Banowsky knew that BEN and Heppner controlled HCLP's bank account because he requested that they use that control to pay his fees and expenses. Dkt. No. 1, ¶284. Banowsky also sought direction from Heppner instead of the nominal managers of the Heppner-controlled entities. Dkt. No. 1, ¶¶ 74, 90–91. The Complaint further alleges Banowsky made these statements with the intent that GWG rely on them in deciding whether to invest in BEN and allow BEN to pay HCLP. Dkt. No. 1, ¶¶ 266, 419.

The Complaint sufficiently pleads reliance because it alleges that the purpose of the November 2019 Call was for the Special Committee's counsel to gain comfort from Banowsky that Heppner did not control HCLP and would not receive any economic interest in proceeds received by HCLP. Dkt. No. ¶ 199. And Banowsky reported to Heppner after the call that "thankfully," Foley & Lardner did not "did not ask for any documents or anything in writing from me" and the call was "very high level." Dkt. No. ¶ 203. Banowsky's debriefing with Heppner, if true, would support that Banowsky made the false statements with intent to induce the GWG Special Committee into transferring $49.8 million to BEN for payment to HCLP in the December 2019 Transaction. The Complaint alleges facts to show that GWG's reliance was reasonable,

including allegations that Banowsky was a trusted advisor to GWG (HK represented GWG in other matters), key GWG and BEN personnel were former HK employees, and GWG's CEO was a long-time HK client. Dkt. No. 1, ¶ 347. And finally, the Complaint alleges GWG was fraudulently induced to send $49.8 million to BEN, which GWG would not have done had it known the truth about Heppner's control over HCLP. Dkt. No. 1, ¶ 420.

## G.  Count VI: Negligent Misrepresentation

To state a negligent misrepresentation claim under Texas law, a plaintiff must allege the defendant made a representation, the representation was false, the defendant did not exercise reasonable care in obtaining or communicating the information, it was foreseeable the plaintiff would rely, the plaintiff justifiably relied, and the plaintiff suffered damages. *Fed. Land Bank Ass'n v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991). The Trustee pleaded that Banowsky made the same four misrepresentations during the November 2019 Call as alleged in the fraud count and that the representations were false for the same reasons as in the fraud count. Dkt. No. 1, ¶ 425–35. The Complaint further states that Banowsky did not exercise reasonable care because he failed to independently verify facts about HCLP's control structure, accepted an unsigned delegation document without question, failed to read trust documents carefully, worked backwards from a predetermined conclusion (that Heppner did not control HCLP) rather than conducting objective analysis, and ignored evidence of Heppner's control (the manager changes he had just orchestrated). Dkt. No. 1, ¶ 425–35. It was foreseeable GWG would rely because Banowsky made the statements directly to GWG's Special Committee counsel, GWG's Special Committee counsel had no other source of information about HCLP's control structure, and Banowsky knew the Special Committee was relying entirely on him for this information. Dkt. No. 1, ¶ 430. GWG's

reliance was justifiable for the same reasons as in the fraud count and GWG suffered damages in the form of the $49.8 million sent to HCLP in the December 2019 Transaction.

### H. Vicarious liability for Holland & Knight

To hold an employer vicariously liable for the misconduct of its employee, a plaintiff must demonstrate: "(1) an agency relationship  existed between the employee and the employer, (2) the employee committed the act, and (3) the act was in the course and scope of the employee's authority." *Zarzana v. Ashley*, 218 S.W.3d 152, 159 (Tex. App.—Houston [14th Dist.]  2007). The Trustee alleges that all of Banowsky's conduct was done in the course and scope of employment as a HK partner. Dkt. No. 1, ¶ 369. This is supported by specific allegations, including that: Banowsky sent relevant communications on HK letterheads, used his HK or TK email accounts and firm signature blocks in communications advancing the scheme, and involved HK or TK in efforts to conceal Heppner's control over HCLP.  Dkt. No. 1, ¶ 370. It is also alleged that HK benefited from Banowsky's conduct because, among other things, HK billed and was paid for services performed by Banowsky and other HK attorneys. Dkt. No. 1, ¶ 370. The Complaint thus sufficiently pleads vicarious liability against HK for all Counts.

### VIII.    CONCLUSION

For the reasons stated herein, the Court finds that the Trustee has adequately pleaded standing to assert the claims in the Complaint.

First, the "specific and unequivocal" standard articulated in *Dynasty Oil and Gas, L.L.C. v. Citizens Bank (In re United Operating, L.L.C.)*, 540 F.3d 351 (5th Cir. 2008) does not apply in this case where claims are being asserted against non-creditor parties. The Plan's retention of "any claim [or] cause of action" is thus sufficient to retain the claims against Defendants. Defendants' Motion to Dismiss based on standing is therefore DENIED.

Second, the Court  finds that although Texas attorney immunity is an important protection that serves vital public policies, it is not a license for fraud. Here, the Trustee has alleged facts that, if proved, would demonstrate that Banowsky: (i) took direction from Heppner, a non-client, rather than from HCLP's managers; (ii) made knowing misrepresentations about HCLP's ownership and control structure; (iii) coordinated with Heppner to engineer backdated restructurings designed to deceive GWG; (iv) made false threats of foreclosure to pressure GWG into unfavorable transactions; (v) served as trustee of trusts within the alleged RICO enterprise (a non-legal role); and (vi) acted to further Heppner's fraudulent extraction scheme rather than to serve HCLP's legitimate interests. These allegations are sufficient to survive dismissal at the pleading stage. Defendants' Motion to Dismiss on attorney immunity grounds is therefore DENIED.

Third, the Court finds that Defendants have not carried their burden to establish on the face of the pleadings that the Trustee's claims are time-barred. The Complaint alleges injuries occurring between 2019 and 2021, all within the applicable limitations periods when measured from GWG's April 20, 2022 bankruptcy filing. The Complaint also pleads a basis for tolling under the discovery rule and fraudulent concealment doctrine. Whether tolling applies, whether GWG exercised reasonable diligence, and when GWG discovered or should have discovered the alleged fraud are fact-intensive questions inappropriate for resolution on a Rule 12(b)(6) motion. Accordingly, Defendants' Motion to Dismiss on statute of limitations grounds is DENIED.

Finally, the Court finds that the Complaint adequately pleads each element of the RICO claims, the state law claims for aiding and abetting breach of fiduciary duty and civil conspiracy, and the fraud and negligent misrepresentation claims with the particularity required under Rule 9(b). The Defendants' Motion to Dismiss based on the argument that Trustee either pleaded itself

out of court or failed to plausibly plead any of its claims is DENIED. An order consistent with this

Memorandum Opinion will be entered on the docket simultaneously herewith.

**SIGNED Thursday, August 13, 2026**

_____
**Eduardo V. Rodriguez**
**Chief United States Bankruptcy Judge**